Joe **COMES** and Comes Vending, Inc., Appellants,

v.

**MICROSOFT CORPORATION, a Washington Corporation, Appellee.**

No. 00–1268.

Supreme Court of Iowa.

June 12, 2002.

Roxanne Barton Conlin of Roxanne Conlin & Associates, P.C., Des Moines, for appellants.

Donald G. Ribble of Lynch, Dallas, Smith & Harman, P.C., Cedar Rapids, and Joseph E. Neuhaus, Alphonzo A. Grant, Jr., and David B. Tulchin of Sullivan & Cromwell, New York, New York, for appellee.

STREIT, Justice.

A group of computer consumers filed suit alleging Microsoft Corporation maintained or used a monopoly in conjunction with its Windows 98 operating system for the purpose of excluding competition or controlling, fixing, or maintaining prices in violation of the Iowa Competition Law. *See* Iowa Code §§ 553.4, 553.5 (1997). On appeal, the consumers urge us to find our state antitrust law is not controlled by federal law, and thereby allow them to sue in Iowa as indirect purchasers. We conclude the Iowa Competition Law is not controlled by federal law and indirect purchasers may maintain an antitrust action in state court. Therefore, the motion to dismiss should have been denied. We reverse and remand.

## I. Background and Facts

Joe Comes is a resident of Polk County, Iowa. Comes Vending, Inc. is a corporation organized and existing under the laws of the State of Iowa. Comes and Comes Vending purchased a Gateway Solo Computer directly from Gateway. The computers came with Windows 98 operating system pre-installed. As a precondition to using Windows 98, they became end-user licensees of Microsoft as to the operation

and use of Windows 98. Comes and Comes Vending registered its ownership of the licenses with Microsoft via electronic mail.

Microsoft is a for-profit corporation organized and existing under the laws of the State of Washington. Microsoft's focus is primarily on developing and licensing computer software. Microsoft is the world's leading supplier of operating systems for personal computers.

Comes and Comes Vending represent the group of all end-user licensees of Windows 98 living in Iowa as to whom Microsoft has an electronic mail address that is computer-accessible by Microsoft (all the foregoing the "Class"). Each member of the Class owns or leases an Intel-based personal computer. The Class filed suit alleging Microsoft maintained or used a monopoly in conjunction with its Windows 98 operating system for the purpose of excluding competition or controlling, fixing, or maintaining prices in violation of the Iowa Competition Law. *See* Iowa Code §§ 553.4, 553.5. The Class further stated,

> [w]ell aware of its unlawfully and willfully maintained monopoly power and in unlawful exercise of that monopoly power, Microsoft has knowingly, flagrantly, and with impunity licensed its Windows 98 operating system for Intel-based personal computers without regard to competition, at a monopoly price in excess of what Microsoft would have been able to charge in a competitive market.

The Class asserted that by virtue of its status as end-user licensees, it incurred a monopoly price charged by Microsoft for use of Windows 98. Microsoft filed a motion to dismiss claiming chapter 553 must be interpreted consistently with federal law and under federal law the Class was deemed to be comprised of indirect purchasers barred from recovering damages for alleged antitrust violation. *See Illinois*

*Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

The Iowa district court, persuaded by the policies of *Illinois Brick*, granted the motion to dismiss. The court concluded the indirect purchaser rule set forth in *Illinois Brick* applied to the Iowa Competition Law. The court noted the similarity between the federal and state statutes, prior interpretations by this court consistent with federal antitrust law, and the statutory directive to "harmonize" state and federal antitrust laws. The court further found this case did not fall within any of the limited exceptions to *Illinois Brick*. The Class appeals.

On appeal, the Class argues this court should hold *Illinois Brick* does not apply and that if it does apply they are direct, not indirect, users under Microsoft's licensing agreement. In the alternative, the Class argues they fall within the exceptions to *Illinois Brick* allowing suits by indirect purchasers.

## II. Scope of Review

We review the grant of a motion to dismiss for correction of errors at law. *State v. Hoegh*, 632 N.W.2d 885, 887 (Iowa 2001). We will affirm the dismissal of a claim only if the petition shows no right of recovery under any state of the facts. *Barnes v. State*, 611 N.W.2d 290, 292 (Iowa 2000). In reviewing the trial court's grant of Microsoft's motion to dismiss, we consider the allegations in the petition in the light most favorable to the Class. *See Sanford v. Manternach*, 601 N.W.2d 360, 363 (Iowa 1999).

## III. The Merits

The only issue on appeal is whether the United States Supreme Court case, *Illinois Brick*, should be followed in interpreting the Iowa Competition Law. The Class

argues this case should not be applied because the Iowa Competition Law does not limit the class of plaintiffs who may bring a state antitrust suit. Microsoft argues Iowa must harmonize the Iowa Competition Law with federal law articulated in *Illinois Brick* such that only direct purchasers may recover damages for antitrust violations. We now turn to the holding of *Illinois Brick* and its applicability to our state competition law.

## A. The Origins of State and Federal Antitrust Laws

In 1976, the Iowa legislature overhauled our state competition law using federal law as a model. Since then, the Iowa Competition Law has provided

> [a] person shall not attempt to establish or establish, maintain, or use a monopoly of trade or commerce in a relevant market for the purpose of excluding competition or of controlling, fixing or maintaining prices.

Iowa Code § 553.5. The Iowa Competition Law also authorizes a very broad category of persons to maintain a suit in our state courts for damages resulting from anti-competitive conduct.

> [A] person who is injured ... by conduct prohibited under this chapter may bring suit to: ... [r]ecover actual damages resulting from conduct prohibited under this chapter.

*Id.* § 553.12(2).

A year after the Iowa legislature enacted our current state antitrust law, the United States Supreme Court was called upon to determine who has standing to sue in federal court for damages resulting from monopolistic conduct. *Illinois Brick,* 431 U.S. at 720, 97 S.Ct. at 2061, 52 L.Ed.2d at 707. The Court's decision in *Illinois Brick* was built upon the Court's prior holding in *Hanover Shoe, Inc. v. United Shoe Mach. Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). In *Hanover Shoe,* plaintiff shoe manufacturer alleged the defendant manufacturer and distributor of shoe-making machinery unlawfully inflated the price of the machinery. The defendant argued the plaintiff, despite being a direct purchaser, did not suffer a legally cognizable injury because the plaintiff had passed on the overcharge to indirect purchasers. The Court held the defendant could not use the pass on [1] theory as a defense. *Hanover Shoe,* 392 U.S. at 494, 88 S.Ct. at 2232, 20 L.Ed.2d at 1242. In so ruling the Court explained,

> [a]s long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows. At whatever price the buyer sells, the price he pays the seller remains illegally high, and his profits would be greater were his costs lower.

*Id.* at 489, 88 S.Ct. at 2229, 20 L.Ed.2d at 1239. In effect, the *Hanover Shoe* Court acknowledged that in a system allowing pass ons, the real victims—those who paid extra money as a result of the pass on— are not compensated. However, in the interests of antitrust public policies, the Court concluded the defendants should not be allowed to use the pass on theory as a defense.[2] The Court would later revisit similar antitrust issues in *Illinois Brick.*

---

1. The term "pass on" describes "the process by which a middleman in the chain of distribution who has been charged by a manufacturer or by a producer adjusts his prices upward so as to pass on his increased costs to his own customers." Annot., 55 A.L.R. Fed. 919, 922 n. 3. (1981).

2. Justice Blackman, joining in Justice Brennan's *Illinois Brick* dissent, commented if not for *Hanover Shoe* he was certain the Court in *Illinois Brick* would have permitted indirect purchasers to maintain an antitrust action. *Illinois Brick,* 431 U.S. at 765, 97 S.Ct. at 2085, 52 L.Ed.2d at 737 (Blackman, J., dis-

In *Illinois Brick*, the State of Illinois brought suit against concrete block manufacturers, alleging price fixing in violation of section four of the Clayton Act. *See* 15 U.S.C. § 15. The provision of the Clayton Act at issue there provides "[a]ny person who shall be injured ... by reason of anything forbidden in the antitrust laws may bring suit to recover damages sustained by him." *Id.* The United States Supreme Court held the state was an indirect purchaser because it did not buy concrete blocks directly from the manufacturers. *Illinois Brick*, 431 U.S. at 726, 97 S.Ct. at 2065, 52 L.Ed.2d at 713. The Court drew a line at which the law will not permit remote antitrust claims to be asserted. This bright line has become known as the "indirect-purchaser rule."

The rule provides indirect purchasers are barred from bringing claims for overcharges under federal law. *Id.* at 728–29, 97 S.Ct. at 2065–66, 52 L.Ed.2d at 714. The Court explained the "direct purchaser, and not others in the chain of manufacture or distribution, is the party 'injured in his business or property' within the meaning of [section 4 of the Clayton Act]." *Id.* Accordingly, the Court concluded federal antitrust law bars claims by indirect purchasers. *Id.* at 745–46, 97 S.Ct. at 2074–75, 52 L.Ed.2d at 725.

Over ten years after *Illinois Brick*, the United States Supreme Court clarified the extent of its ruling. The Court was faced with the question of whether state statutes expressly granting standing to indirect purchasers were preempted by federal law to the contrary. It held nothing in the Sherman Act [3] or in *Illinois Brick* prevents the states from allowing indirect purchasers to bring antitrust actions, even if this results in multiple recoveries. *California v. ARC Am. Corp.*, 490 U.S. 93, 101–02, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86, 95 (1989). However, this decision itself did not create a cause of action for indirect purchasers to pursue.[4] It merely autho-

senting). Commenting on *Hanover Shoe*, Justice Brennan stated, "[d]espite the superficial appeal of the argument that *Hanover Shoe* should be applied 'consistently,' thus precluding plaintiffs and defendants alike from proving that increased costs were passed along the chain of distribution, there are sound reasons for treating offensive and defensive passing-on cases differently." *Id.* at 754, 97 S.Ct. at 2078, 52 L.Ed.2d at 730 (Brennan, J., dissenting). Justice Brennan stated the same policies at the heart of *Hanover Shoe*—"insuring continued effectiveness of the treble-damages action and preventing wrongdoers from retaining the spoils of their misdeeds"—favor permitting indirect purchasers to prove they absorbed an overcharge as a result of a direct purchaser's pass on. *Id.* Justice Brennan advocated limiting *Hanover Shoe* to cases where the defendant uses the pass on theory defensively and where direct and indirect purchasers are not parties in the same action. *Id.*

3. Congress enacted the first of the federal antitrust statutes in 1890 under the Sherman Act. In it, Congress authorized a private cause of action for treble damages and attorney's fees to any person injured as a result of antitrust violations. This provision was reenacted as section four of the Clayton Act.

4. A Maryland federal district court granted Microsoft's motion to dismiss the money damages claims in a number of private antitrust cases against Microsoft virtually identical to the case before us. *In re Microsoft Corp. Antitrust Litig.*, 127 F.Supp.2d 702 (D.Md. 2001), *leave to appeal denied sub nom. Kloth v. Microsoft Corp.*, No. 01–656, CA–11–2117–JFM (4th Cir. June 27, 2001). The Maryland court in this case held the plaintiffs as indirect purchasers were barred from bringing claims for alleged overcharges under federal law, pursuant to *Illinois Brick*. However, the court expressly reserved comment on whether *Illinois Brick* was incorporated into the state law of a number of states pending resolution of current appeals, including the one before us, that raised the issue. *See also Arnold v. Microsoft Corp.*, No. 00–CI–00123, 2001 WL 193765 (Ky.Cir.Ct. July 21, 2000), *aff'd*, No. 2000–CA–002144–MR, 2001 WL 1835377 (Ky. Ct.App. Nov.21, 2001); *Kieffer v. Mylan Labs.*, No. BER–L–365–99–EM, 1999 WL 1567726

rized the states to provide a cause of action for indirect purchasers based on state antitrust law. The Class asserts this case compels Iowa to find the same and allow indirect purchasers to recover under state law. We must determine whether we should interpret Iowa antitrust law in the same way the United States Supreme Court has interpreted federal antitrust law.

### B. Interpretation of the Iowa Competition Law

■■■ Our first role is to interpret the state antitrust statute. We apply our familiar rules of statutory interpretation to the words of the statute. Our goal in interpreting the Iowa Competition Law is to give effect to the purpose and intent of the legislature. *State v. Owens*, 635 N.W.2d 478, 485 (Iowa 2001). In examining the words of the statute, we give words their ordinary and common meaning absent any specific legislative meaning or meaning in law. *Id.* at 486. If there is no ambiguity, but the plain meaning of the statute is ascertainable, our inquiry must end. *State v. Welton*, 300 N.W.2d 157, 160 (Iowa 1981).

■■■ The state antitrust statute is clear on its face. The statute provides, "[a] person who is injured ... by conduct prohibited under this chapter may bring suit." Iowa Code § 553.12. This statute does not restrict the class of persons who may bring suit under the Iowa Competition Law. Nothing in the statute says in order to seek redress for antitrust violations a purchaser must be directly injured.[5] The legislature did not specifically limit standing to direct purchasers, but instead it simply authorized "[a] person who is injured" to sue. Legislative intent is determined by what the legislature said, not by what it did not say or might have said. *State v. Beach*, 630 N.W.2d 598, 600 (Iowa 2001); *see Bunker's Glass Co. v. Pilkington, plc*, 47 P.3d 1119, 1128 (Ariz. Ct. App.2002). Therefore, we do not regard our legislature's failure to explicitly authorize indirect purchasers to maintain a suit for antitrust violations as an expression of its agreement with *Illinois Brick*. See *Bunkers's Glass Co.*, 47 P.3d at 1128–29. Given the clear, broad language of the state antitrust law, we conclude the Iowa Competition Law creates a cause of action for *all* consumers, regardless of one's technical status as a direct or indirect purchaser.

Despite the plain language of the statute, Microsoft argues Iowa does not have authority to allow indirect purchasers re-

(N.J.Super.Sept. 9, 1999); *Arnold v. Microsoft Corp.*, No. 00–CI–00123, 2001 WL 193765 (Ky.Cir.Ct. July 21, 2000), *aff'd*, No.2000–CA–002144–MR, 2001 WL 1835377 (Ky.Ct.App. Nov.21, 2001).

5. The distinction between direct and indirect purchasers in antitrust law is akin to early distinctions in product liability tort law between tort plaintiffs in privity with the manufacturer and those who were not in direct privity. Early cases refused to allow injured plaintiffs to recover from the manufacturer if the parties were not in privity. However, the trend in tort law soon relaxed and many jurisdictions began to allow such suits. In a prominent case, the New York Court of Appeals found it may be "inferred from the nature of the transaction" that "in the usual course of events the danger will be shared by others than the [direct] buyer." *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 389–90, 111 N.E. 1050–51, (1916) (discussing the progression of the law since the landmark case in the Court of Appeal of England, *Heaven v. Pender*, L.R. 11 Q.B. Div. 503 (1882–83)). The courts now recognize that in product liability, an "indirect purchaser," i.e., one who is not in privity with the manufacturer, is the one more often directly injured by a manufacturer's negligent conduct. Consequently, courts will allow an indirect purchaser in this situation to recover damages.

dress under our state antitrust laws because our legislature has mandated that the Iowa Competition Law shall be construed to complement federal law. Therefore, Microsoft argues, Iowa is bound by the federal law. The harmonization statute upon which Microsoft relies provides,

> This chapter shall be construed to complement and be harmonized with the applied laws of the United States which have the same or similar purpose as this chapter. This construction shall not be made in such a way as to constitute a delegation of state authority to the federal government, but shall be made to achieve *uniform application of the state and federal laws prohibiting restraints of economic activity and monopolistic practices.*

Iowa Code § 553.2 (emphasis added). Given this statutory provision, the district court agreed with Microsoft and concluded interpretation of the Iowa Competition Law is bound by federal law announced in *Illinois Brick.* We disagree with this conclusion.

■■■■ We do not find Iowa Code section 553.2 requires Iowa courts to interpret the Iowa Competition Law the same way federal courts have interpreted federal law. In fact, the harmonization statute specifically states the provision "shall not be made in such a way as to constitute a delegation of state authority to the federal government." This is not an issue of federal preemption of state law. This argument has been consistently rejected by the United States Supreme Court and by us today. *Emergency One, Inc. v. Waterous Co.,* 23 F.Supp.2d 959, 967 (E.D.Wis.1998). Congress intended federal antitrust laws to supplement, not displace state antitrust remedies. *Id.* (citing *ARC Am.,* 490 U.S. at 102, 109 S.Ct. at 1661, 104 L.Ed.2d at 95). Furthermore, because *Illinois Brick* was a decision construing only federal anti-

trust law, it did not define the connection, if any, between federal and state antitrust laws. The "concept of federalism assumes power, and duty, of independence in interpreting our own organic law." *Pool v. Superior Ct.,* 139 Ariz. 98, 677 P.2d 261, 271 (Ariz.1984). Given that there is no federal preemption on this issue, we must construe the Iowa Competition Law to encourage the primary goal of antitrust law. *Neyens v. Roth,* 326 N.W.2d 294, 297 (Iowa 1982) (antitrust laws are remedial and should be broadly construed to effect their purposes); *see Bunker's Glass Co.,* 47 P.3d at 1124.

■■■ In construing the Iowa. Competition Law, we are bound by the purpose of our harmonization provision. Contrary to Microsoft's assertion, this provision is not aimed at defining who can sue under our state antitrust law. Rather, our legislature clearly announced the purpose of the harmonization statute by stating it is designed to achieve uniform application of the state and federal laws prohibiting monopolistic practices. *See* Iowa Code § 553.2. The purpose behind both state and federal antitrust law is to apply a uniform standard of conduct so that businesses will know what is acceptable conduct and what is not acceptable conduct. To achieve this uniformity or predictability, we are not required to define who may sue in our state courts in the same way federal courts have defined who may maintain an action in federal court. Rather, our guiding principle in interpreting the Iowa Competition Law is to do so in such way as to prohibit "restraints of economic activity and monopolistic conduct." Harmonizing our construction and interpretation of state law as to what conduct is governed by the law satisfies the harmonization provision.

Moreover, there is no plain inconsistency between the policies behind the Iowa

Competition Law and those underlying federal antitrust law. The United States Supreme Court has held that two statutes, both of which prohibit anticompetitive conduct, are not inconsistent merely because one allows indirect purchasers to sue for damages while the other does not. *Mack v. Bristol–Myers Squibb Co.*, 673 So.2d 100, 110 (Fla.Dist.Ct.App.1996) (citing generally *ARC Am.*, 490 U.S. at 93, 109 S.Ct. at 1661, 104 L.Ed.2d at 86). The federal antitrust statute shows Congress' concern with the protection of competition, not competitors. *State v. Cedar Rapids Bd. of Realtors*, 300 N.W.2d 127, 129 (Iowa 1981) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510, 533 (1962)). The goal of federal antitrust law is to prohibit restraint of economic activity and monopolistic practices. Our state antitrust law promotes the same consumer protection policies as does federal antitrust law by "assur[ing] customers the benefits of price competition." *See Associated Gen. Contractors of California, Inc. v. Carpenters*, 459 U.S. 519, 538, 103 S.Ct. 897, 908, 74 L.Ed.2d 723, 738 (1983). In order for us to agree with Microsoft that the harmonization statute requires us to prohibit suits by indirect consumers, we must accept the fact that real victims— those who purchase goods and pay the overcharge—cannot recover. This result would overwhelmingly defeat the purpose of the Iowa Competition Law. Consumers in this state are best protected by permitting all injured purchasers to bring suit against those who violate our antitrust laws.

As a final consideration in our interpretation of the Iowa Competition Law, we must strive to effectuate the purpose and intent of the legislature. In order to accomplish this, we examine what the current state of the law was at the time our state legislature enacted the Iowa Competition Law. The Iowa legislature passed the current Iowa Competition Law one year before the decision in *Illinois Brick*. Consequently, it was impossible for the legislature to have adopted a judicial construction which did not exist at that time. The legislature did not have the opportunity to discuss *Illinois Brick* and accept or reject its law before passing the Iowa Competition Law. *See Bunker's Glass Co.*, 47 P.3d at 1129 ("We do not consider the legislature's post–1977 silence on the issue of indirect purchaser standing as an indication that it acquiesces in the holding of *Illinois Brick*.").

Because Iowa took its cues from federal law in creating our state antitrust statute, the federal law in place before *Illinois Brick* is instructive. Prior to the court's ruling in *Illinois Brick*, most federal courts construed section four of the Clayton Act to allow suits by indirect purchasers. *Hyde v. Abbott Labs. Inc.*, 123 N.C.App. 572, 473 S.E.2d 680, 685 (N.C.Ct.App.1996) (citations omitted). In fact before the *Illinois Brick* ruling, six of the seven federal courts of appeals that considered this issue held indirect purchasers could recover damages for antitrust violations. Cynthia Urda Kassis, *The Indirect Purchaser's Right to Sue Under Section 4 of the Clayton Act: Another Congressional Response to Illinois Brick*, 32 Am. U.L.Rev. 1087, 1098 (1983) (hereinafter Kassis).[6] Moreover, even the United States Supreme Court prior to *Illinois Brick* consistently recognized Congress' intent in enacting section four of the Clay-

---

**6.** Citing *In re W. Liquid Asphalt Cases*, 487 F.2d 191 (9th Cir.1973); *Yoder Bros., Inc. v. Cal.-Fla. Plant Corp.*, 537 F.2d 1347 (5th Cir. 1976); *Illinois v. Bristol–Myers Co.*, 470 F.2d 1276 (D.C.Cir.1972); *West Virginia v. Chas. Pfizer & Co.*, 440 F.2d 1079 (2d Cir.1971); *In re Master Key Antitrust Litig.*, 1973–2 Trade Cas. (CCH) ¶ 74,680 (D.Conn.1973).

ton Act was to protect all victims of antitrust infringements. *Id.* When the Iowa legislature enacted the Iowa Competition Law, it did so considering the federal law prior to *Illinois Brick* which allowed indirect purchasers to bring antitrust suits. To the extent we consider relevant federal precedent on this subject as persuasive, we find the status of federal law before *Illinois Brick* supports our conclusion that the Iowa legislature intended indirect purchasers to have standing under the Iowa Competition Law. *See Neyens,* 326 N.W.2d at 297 (in construing the Iowa Competition Law, federal cases are of "some help" and we must consider them).

Microsoft relies much on other recent state court rulings on this issue. A number of these state courts have decided not to permit indirect purchasers to sue in state court. *See Vacco v. Microsoft Corp.,* 260 Conn. 59, 793 A.2d 1048 (Conn.2002); *Berghausen v. Microsoft Corp.,* 765 N.E.2d 592 (Ind.Ct.App.2002); *Arnold v. Microsoft Corp.,* No. 2000–CA–002144–MR, 2001 WL 1835377 (Ky.Ct.App. Nov.21, 2001); *Davidson v. Microsoft Corp.,* 143 Md.App. 43, 792 A.2d 336 (Md.Ct.App.2002); *Siena v. Microsoft Corp.,* No. C.A. 00–1647, 2000 WL 1274001 (R.I.Super.Ct. Aug. 21, 2000). On the other hand, in the wake of the *Illinois Brick* decision, many other states passed legislation insuring indirect purchasers would continue to have a remedy

under state law. In total, nineteen states, the District of Columbia, and Puerto Rico have statutes explicitly authorizing indirect purchasers to maintain an antitrust suit.[7] Seventeen other states permit recovery on behalf of consumers, either in the form of restitution or damages under state consumer protection laws or state unfair trade practices statutes. Kevin J. O'Connor, *Is the Illinois Brick Wall Crumbling?* 15 Antitrust 34, 34–35 (2001) (hereinafter O'Connor).[8] In total, thirty-six states and the District of Columbia recognize a cause of action for indirect purchasers. *Id.* Additionally, another four states allow the state attorney general to initiate a lawsuit on behalf of the government or natural persons. *Id.*[9]

Though interesting, what a few other states have chosen to do with their various antitrust laws is not determinative of what is permitted under Iowa state antitrust law. The fact that some other state courts have chosen to bar antitrust suits by indirect purchasers does not deter us from interpreting the Iowa Competition Law consistently with legislative intent and policies behind our antitrust law. Moreover, the fact that thirty-six jurisdictions allow antitrust suits by indirect purchasers militates against Microsoft. This certainly shows a trend, even if by statute, to allow any injured person to maintain a suit. In Iowa, without express legislative comment

---

7. *See, e.g.,* Cal. Bus. & Prof.Code § 16750(a) (enacted in 1978); D.C.Code Ann. § 28–4509 (1980); Haw.Rev.Stat. §§ 480–3, 480–14 (enacted in 1987); 740 Ill. Comp. Stat. § 10–7(2) (West 1997); Kan. Stat. Ann. 10, § 1104 (enacted in 1989); Md.Code Ann., Com. Law I § 11–209(b)(2)(ii) (enacted in 1982); Mich. Comp. Laws Ann. § 445.778(2) (enacted in 1984); Minn.Stat. Ann. § 325D.57 (enacted in 1984); N.M. Stat. Ann. § 57–1–3(A) (1979); N.Y. Gen. Bus. Law § 340(6) (enacted in 1980); S.D. Codified Laws § 37–1–33 (enacted in 1980); Wis. Stat. § 133.18(1)(a) (enacted in 1979).

8. These states are: Alaska, Arizona, Arkansas, Connecticut, Florida, Kentucky, Louisiana, Massachusetts, Missouri, North Carolina, Ohio, Oklahoma, South Carolina, Tennessee, Utah, Washington, and West Virginia. O'Connor, 15 Antitrust at 35 n. 4.

9. These states are: Colorado, Delaware, Maryland, and Virginia. O'Connor, 15 Antitrust at 35 n. 6.

to the contrary, it is appropriate to interpret the Iowa Competition Law in conformity with this trend. In sum, based on the words of the statute, we conclude the Iowa antitrust law is not bound by the federal antitrust law announced in *Illinois Brick*.

## C. *Illinois Brick* Policies

Though our primary role is to interpret the words of our statute, in determining the intent of the legislature, it is also helpful to examine the policies underlying *Illinois Brick* to determine whether they are applicable to the issue before us.[10] The *Illinois Brick* court was primarily concerned with policy considerations which have not materialized as it envisioned actions in state court. In holding indirect purchasers could not sue to enforce federal antitrust laws, the *Illinois Brick* court was wholly concerned with the complexity of litigation and the possibility of multiple liability. In barring indirect purchaser suits, the Court reasoned that direct purchasers have the greatest incentive to enforce antitrust laws. We conclude these policy considerations have little, if any,

applicability to antitrust suits in state court.

In holding indirect purchasers could not sue to enforce federal antitrust laws, the Court in *Illinois Brick* was concerned with the possibility of multiple liability. *Illinois Brick*, 431 U.S. at 730, 97 S.Ct. at 2067, 52 L.Ed.2d at 715. The fear was that both direct and indirect purchasers would each recover the full amount of the overcharge subjecting the antitrust violator to liability more than the allowed three times the amount of the violation.[11] However, given the facts of the case before us, the concern of multiple liability is unfounded. "[T]here are few, if any, reported instances of a defendant paying treble damages to two different classes of purchasers based on a single antitrust violation." *Hyde*, 123 N.C.App. 572, 583, 473 S.E.2d 680 (citing Thomas Greene, *Should Congress Preempt State Indirect Purchaser Laws? Counterpoint: State Indirect Purchaser Remedies Should be Preserved*, 5 Antitrust 25, 26–27 (1990)); *see* O'Connor, 15 Antitrust at 37. Furthermore, the district courts are fully capable of ensuring antitrust defendants are not forced to pay more in damages than amounts to which

---

**10.** A number of legal commentators have criticized *Illinois Brick* for its bad public policy. *See Bunker's Glass Co.*, 47 P.3d at 1129 (citing Phillip E. Areeda, Roger D. Blair & Herbert Hovencamp, Antitrust Law 346, at 378 (2000); Joseph P. Bauer, *The Stealth Assault on Antitrust Enforcement: Raising the Barriers for Antitrust Injury and Standing*, 62 U. Pitt. L.Rev. 437 (2001); Roger D. Blair & Jeffrey L. Harrison, *Reexamining the Role of Illinois Brick in Modern Antitrust Standing Analysis*, 68 Geo. Wash. L.Rev. 1 (1999); Kevin J. O'Connor, *Is the Illinois Brick Wall Crumbling?*, 15 Antitrust 34, 34–35, 37–38 (2001); Robert G. Harris & Lawrence A. Sullivan, *Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis*, 128 U. Pa. L.Rev. 269, 270–73, 338–54 (1979)); Jeff Patterson, *Microsoft Antitrust Litigation: Illinois Brick Defeats its Intended Purpose*, 5 J. Small & Emerging Bus. L. 377 (2001).

**11.** Several state legislatures had similar concerns in enacting their state antitrust statutes. *See, e.g.,* 740 Ill. Comp. Stat. § 10–7(2) (West 1997) ("the court shall take all steps necessary to avoid duplicative liability for the same injury including transfer and consolidation of all actions"); N.M. Stat. Ann. § 57–1–3(C) (1979) ("any defendant, as a partial or complete defense . . . may, in order to avoid duplicative liability . . . be entitled to prove that the plaintiff purchaser or seller . . . who paid any overcharge or received any underpayment, passed on all or any part of such overcharge or underpayment to another purchaser"); S.D. Codified Laws § 37–1–33 (enacted in 1980) ("the court may take any steps necessary to avoid duplicative recovery").

the injured parties are entitled. *Bunker's Glass Co.*, 47 P.3d at 1130 (citing *In re W. Liquid Asphalt Cases*, 487 F.2d at 201 ("The day is long past when courts . . . will deny relief to a deserving plaintiff merely because of procedural difficulties or problems of apportioning damages.")). Even assuming such danger of multiple liability exists, there is no federal policy against states imposing liability in addition to that imposed under federal law. *Id.* We conclude it is in the best interests of the citizens of Iowa to allow indirect purchaser suits despite the remote possibility of multiple liability.

The Court in *Illinois Brick* also stated those who were directly injured have the greatest incentive to bring suit to enforce antitrust laws. *Illinois Brick*, 431 U.S. at 735, 97 S.Ct. at 2069, 52 L.Ed.2d at 718. However, later in *ARC America*, the Court stated "[s]tate indirect purchaser statutes pose no similar risk to the enforcement of the federal law." *ARC Am.*, 490 U.S. at 104, 109 S.Ct. at 1667, 104 L.Ed.2d at 97. Clearly, direct purchasers such as Dell, Compaq, Gateway, and IBM have not sued Microsoft for antitrust infringements. Even the majority in *Illinois Brick* recognized that direct purchasers likely will not enforce antitrust laws out of fear of retaliation by their suppliers, such as Microsoft—the sole supplier of a popular operating system. *See Illinois Brick*, 431 U.S. at 746, 97 S.Ct. at 2074–75, 52 L.Ed.2d at 725. Instead, the direct purchasers pass the overcharge onto indirect consumers who are ultimately damaged by Microsoft's monopolistic conduct. *See id.* at 764, 97 S.Ct. at 2084, 52 L.Ed.2d at 736 (Brennan, J., dissenting); *Mack*, 673 So.2d at 108 n. 7; *see also* Jeff Patterson, Note, *Microsoft Antitrust Litigation: Illinois Brick Defeats its Intended Purpose*, 5 J. Small & Emerging Bus. L. 377, 384–85 (2001). The fact that no direct purchaser has yet sued Microsoft for antitrust violations suggests that no direct purchaser will do so.

It is the indirect purchaser, not the direct purchaser, who is most frequently injured. Kassis, 32 Am. U.L.Rev. at 1087 ("Price fixing and other antitrust violations most frequently injure indirect purchasers—those who purchase goods through retailers and other middlemen rather than directly from the antitrust violator." (citing S.Rep. No. 96–239 at 2 (1979)). The *Illinois Brick* majority conceded the ultimate effect of allowing only direct purchaser suits is that the person "actually injured"—the indirect purchaser who paid the overcharge—will have no redress. *Illinois Brick*, 431 U.S. at 746, 97 S.Ct. at 2075, 52 L.Ed.2d at 725. The true incentive to enforce antitrust law lies with the real victims, like those of the Class, who may lack a direct business relationship with the antitrust violator. *See* O'Connor, 15 Antitrust at 38. Therefore, to facilitate enforcement of the policies behind the Iowa Competition Law, indirect purchasers, the real victims, must be authorized to bring a cause of action in state court. In allowing indirect purchaser suits in Iowa, we do nothing more than recognize the concern articulated by the *Illinois Brick* Court and fashion a remedy for the ultimate victims of antitrust violations.

Finally, the Court in *Illinois Brick* stated its concern that allowing indirect purchasers to sue would result in highly complex litigation. *Illinois Brick*, 431 U.S. at 745–47, 97 S.Ct. at 2074–75, 52 L.Ed.2d at 724–25. The *Illinois Brick* Court feared the determination of damages would become complicated because direct purchasers damaged by the overcharge would simply pass on the increased cost to consumers. Consequently, the damages must be apportioned among a number of parties. *Id.* at 745–47, 97 S.Ct. at 2074–75, 52 L.Ed.2d at 724–26. The Court stated liti-

gation would grow increasingly more complicated because the determination of damages on a proportionate scale would be very difficult. *Id.* at 732, 97 S.Ct. at 2067–68, 52 L.Ed.2d at 716–17. However, the House Report on H.R. 11942 concluded the Court overstated the potential complexity in *Illinois Brick.* Kassis, 32 Am. U.L.Rev. at 1116 (citing H.R.Rep. No. 95–1397 at 13 (1978)). Both the Senate Judiciary Committee and the Class acknowledged this is a valid concern. However, both also correctly stated we should not defeat the ends of justice simply because the litigation may be complicated. *See id.* (citing S.Rep. No. 95–934 at 6–7 (1978) (concluding the difficulty in proving pass-on damages does not justify ignoring the rights of indirect purchasers and the courts or legislature can resolve any management problems that may be inherent in the litigation)).

Complexity is not a foreign concept in the world of antitrust. These cases typically involve highly intricate litigation. *See Illinois Brick,* 431 U.S. at 758, 97 S.Ct. at 2081, 52 L.Ed.2d at 733 (Brennan, J., dissenting); *see also Bunker's Glass Co.,* 47 P.3d at 1125. We also note there is an absence of cases in which the court was faced with the impossible task of apportioning damages. The situation before us is further distinguishable from *Illinois Brick* because here we are dealing with only one manufacturer. The Court in *Illinois Brick* was faced with the possibility of tracing overcharges through multiple manufacturers. Certainly, that situation presents increased difficulties that are not found in the case before us. We conclude the possibility of complex litigation is an insufficient reason for us to find indirect purchasers must be barred from bringing a state cause of action for antitrust violations.

## IV. Conclusion

Nothing in the Iowa Competition Law or in federal antitrust law requires us to find indirect purchasers may not maintain an antitrust action in Iowa state courts. We conclude our antitrust law contemplates *all* injured consumers are authorized to bring suit to enforce our antitrust laws. Since the Class may pursue an action for violation of the Iowa Competition Law it has stated a claim upon which relief may be granted. We conclude the motion to dismiss should not have been granted and reverse and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

All justices concur except CARTER and CADY, JJ., who dissent.

CARTER, Justice (dissenting).

Contrary to the opinion of the court, I believe that the reasons advanced by the Court in the *Illinois Brick Co.* case, 431 U.S. at 745–46, 97 S.Ct. at 2074–75, 52 L.Ed.2d at 724–25, for precluding recovery by indirect purchasers under federal antitrust law, are persuasive and apply with equal force to the issue of such recovery under state antitrust laws. I would affirm the judgment of the district court.

CADY, Justice (dissenting).

I respectfully dissent.

The majority articulates many policies that support permitting an indirect purchaser to sue under the Iowa Competition Law, and has identified a few other states that permit an indirect purchaser to sue. Nevertheless, this case is not about which policy is better or trends in other states. If it were, the majority would have to acknowledge that the authority for indirect purchasers to sue in other states has typically been traced to specific legislative enactments in those states or a statutory

scheme that does not include a rule of construction requiring state law to follow federal court interpretations of the federal antitrust statutes. *See Vacco*, 793 A.2d at 1061 n. 20. Instead, I believe this case solely involves the interpretation of our Iowa statute, and the majority has failed to interpret the statute according to the directive of our legislature.

We do not determine the policy of our law, nor establish trends for our legislature. We only seek to interpret statutes consistent with the intent of our legislature.

The key to the resolution of the issue in this case rests on the interpretation of section 553.12 of the Iowa Competition Law. This law generally prohibits restraint of trade or the use of a monopoly to exclude competition or influence prices in the market, subject to certain exemptions. Iowa Code §§ 553.4–.6. The law also gives criminal and civil enforcement powers to the attorney general of this state, including the power to investigate. *Id.* §§ 553.7, .9. Additionally, the law authorizes the state, or "a person who is injured" by the prohibitive competition, to bring an action to, *inter alia*, recover actual damages. *Id.* § 553.12(2). The question in this case is whether our legislature intended this language to include a person who can only claim an indirect injury.

On its face, this question has no easy resolution. The cause of action created under the statute extends to "a person who is injured." Yet, our legislature did not further define "a person who is injured" by the conduct prohibited under the law.

The majority concludes the language of the statute is clear and unambiguous on its face, and creates a cause of action for all consumers, without any restrictions on the class or type of consumer. It then minimizes and ultimately rejects the specific rule of construction our legislature provid-

ed for us in section 553.2 to resolve disputes over the meaning of the competition law. Finally, it reviews the various policy considerations underlying the issue whether to allow lawsuits by indirect purchasers, and adopts the policies that favor antitrust actions by indirect purchasers. In my mind, the majority has utilized faulty reasoning, and abandoned its judicial role. Under the fundamental doctrine of separation of powers, we are obligated to construe statutes to carry out the will of the legislative branch. 2A Norman J. Singer, *Sutherland Statutory Construction* § 45:03, at 19–20 (6th ed.2000) [hereinafter *Sutherland Statutory Construction*]. The majority has ignored the expressed will of the legislature and has become the policymakers of our government.

The very premise used by the majority is simply incorrect. The statute is not clear and unambiguous, and I can find no other jurisdiction in this country that has taken such an approach when faced with the question before us. An ambiguity exists in a statute "when a statute is capable of being understood by reasonably well-informed persons in two or more different senses." *Id.* § 45:02, at 11–12. Considering the simple fact that most jurisdictions have concluded that indirect purchasers are not persons who are injured under antitrust law, I would conclude on that basis alone that our statute is capable of different meanings.

To resolve the ambiguity of the statute, we are obligated to ascertain the legislative intent, and we have adopted a variety of rules and principles to accomplish this purpose, just as our legislature has provided a variety of general rules of statutory interpretation. *See* Iowa Code ch. 4 (delineating rules to apply in the construction of statutes). Yet, in this instance, our legislature has provided a general interpretative rule specifically applicable to

the Iowa Competition Law. Iowa Code section 553.2 provides:

> *This chapter shall be construed* to complement and be harmonized with the applied laws of the United States which have the same or similar purpose as this chapter. This construction shall not be made in such a way as to constitute a delegation of state authority to the federal government, but shall be made to achieve uniform application of the state and federal laws prohibiting restraints of economic activity and monopolistic practices.

(Emphasis added.)

We have recognized that interpretational directives, such as legislative definitions, are binding on us in our role of interpreting statutes. *S & M Fin. Co. v. Iowa State Tax Comm'n*, 162 N.W.2d 505, 507 (Iowa 1968). Internal legislative construction is given the highest value by courts, and prevails over other extrinsic statutory aides of construction. 1A *Sutherland Statutory Construction* § 27:2, at 625–26 (6th ed.2002); *see Lauridsen v. City of Okoboji Bd. of Adjustment*, 554 N.W.2d 541, 543 (Iowa 1996); *S & M Fin. Co.*, 162 N.W.2d at 508. Similarly, specific legislative directives specifying how a particular statute should be construed and applied should also be binding on us, and utilized to resolve doubts over the meaning of a statute. 1A *Sutherland Statutory Construction* § 27:1, at 624, § 27:3, at 631.

Thus, in resolving the question whether "a person who is injured" includes an indirect purchaser, we must rely on the guidance of the interpretive statute given to us by the legislature as its expression of the very intent we are obligated to ascertain and follow. This statute specifically directs that the Iowa Competition Law "be construed to complement and be harmonized with the applied laws of the United States which have the same or similar

purpose as this chapter." Iowa Code § 553.2. To further assist us, our legislature indicated that this rule of construction was not established as a means of delegating authority to the federal government, but to achieve uniform application of the state and federal laws governing competition. *Id.*

The majority attempts to minimize the impact of this statutory rule of construction by declaring that it does not establish federal preemption of state law and does not apply to the remedy portion of the Iowa Competition Law, but only to the provisions dealing with prohibited conduct. These arguments are simply misplaced. First, the fact that section 553.2 is not a doctrine of federal preemption does not minimize its application as a rule of construction. The statute is what it is: an important key to guide courts interpreting the Iowa Competition Law. Second, it is not limited to any specific part of the Iowa Competition Law, but applies to every statutory provision within the competition law. Section 553.2 makes this abundantly clear by pronouncing, "This chapter shall be construed ...." The legislature then merely explained that it was establishing a rule of construction, not a federal preemption doctrine, and in doing so mentioned its desire for uniformity in the law prohibiting anti-competition practices. Clearly, this explanation was not intended as a restriction on the rule of construction to limit it to those specific sections of the chapter that define monopolistic practices. Moreover, an explanation that the law be construed to be uniform with federal law prohibiting competition is not inconsistent with the rule that "[t]his chapter" be construed to complement federal law as interpreted by the federal courts.

Section 553.2 directs us to construe the Iowa Competition Law to complement and harmonize its provisions with the federal

law as applied by the federal courts. *Id.* Our legislature wanted to achieve uniform application of state and federal antitrust law. *Id.*

Within a year following enactment of the legislative rule of construction, the United States Supreme Court held that a person who is not a direct purchaser from a violator is not authorized to bring a federal antitrust suit under section 4 of the Clayton Act, 15 U.S.C. § 15(a). *Illinois Brick Co.*, 431 U.S. at 745–46, 97 S.Ct. at 2074–75, 52 L.Ed.2d at 725. Similar to section 553.12, section 4 of the Clayton Act provides "[a]ny person who shall be injured . . . by reason of anything forbidden in the antitrust laws may sue . . . ." 15 U.S.C. § 15(a).

Thus, the conclusion we must draw is clear. The federal courts have interpreted the federal antitrust law to exclude indirect purchasers as "a person who has been injured." Our legislature wants us to harmonize the Iowa Competition Law with federal antitrust law so that the two laws will have uniform application. This directive is a clear indication our legislature intended to exclude indirect purchasers.

The majority, nevertheless, declares it is not inconsistent to give an indirect purchaser a cause of action in state court, while precluding such a cause of action in federal court. This argument, however, can only be formulated by debating the policy of the law and minimizing the scope of the legislative directive. This is not our role. We must interpret the meaning of the language of section 553.12 by utilizing the directives of section 553.2.

Lastly, the majority argues that section 553.2 cannot be viewed as a legislative endorsement of *Illinois Brick* because the opinion was not decided until after section 553.2 was enacted. There is, however, nothing in section 553.2 to even hint that our legislature only wanted our competition law to be uniform with the applied laws of the federal government as they existed at the time section 553.2 was enacted. In fact, such an approach would be contrary to the clear intent of our legislature to maintain uniformity between state and federal law. The rule of construction established by section 553.2 is unrelated to the doctrine of legislative acquiescence of existing legal principles. It is, plain and simple, a rule of construction. We are obligated to use it, which leads only to one result. The majority has failed to reach this result, and, by doing so, has engaged in lawmaking in violation of the separation of powers doctrine.