PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 08-2784/2785/2798/2799/2818/2819/2831/2881
_____

SHAWN SULLIVAN; ARRIGOTTI FINE
JEWELRY; JAMES WALNUM, on behalf of
themselves and all others similarly situated,

v.

DB INVESTMENTS, INC; DE BEERS S.A.;
DE BEERS CONSOLIDATED MINES, LTD;
DE BEERS A.G.; DIAMOND TRADING COMPANY;
CSO VALUATIONS A.G.; CENTRAL SELLING
ORGANIZATION; DE BEERS CENTENARY A.G.

> DAVID T. MURRAY, Appellant in
> 08-2784
> (Pursuant to Fed. R. App. P. 12(a))
>
> SUSAN M. QUINN, Appellant in
> 08-2785
> (Pursuant to Fed. R. App. P. 12(a))
>
> MARVIN L. UNION; TIM
> HENNING; NEIL FREEDMAN;
> KYLIE LUKE; WILLIAM

BENJAMIN COFFEY, Jr.,
Appellants in 08-2798
(Pursuant to Fed. R. App. P. 12(a))

AARON PETRUS, Appellant in
08-2799
(Pursuant to Fed. R. App. P. 12(a))

JANET GIDDINGS, Appellant in
08-2818
(Pursuant to Fed.R.App.P. 12(a))

FRANK ASCIONE;
ROSAURA BAGOLIE;
MATTHEW DELONG;
SANDEEP GOPALAN;
MANOJ KOLEL-VEETIL;
MATTHEW METZ;
ANITA PAL; DEB K PAL;
JAY PAL; PETER PERERA;
RANGESH K. SHAH;
ED MCKENNA;
THOMAS VAUGHAN,
Appellants in 08-2819
(Pursuant to Fed.R.App.P. 12(a))

KRISTEN DISHMAN;
MARGARET MARASCO,
Appellants in 08-2831
(Pursuant to Fed.R.App.P. 12(a))

2

JAMES B. HICKS, Appellant in
08-2881
(Pursuant to Fed. R. App. P. 12(a))

_____

On Appeal from the United States District Court
for the New Jersey
(D.C. No. 04-cv-2819)
District Judge: Honorable Stanley R. Chesler

_____

No. 08-2785 Argued January 28, 2010
Nos. 08-2784/2798/2799/2818/2819/2831/2881 Submitted
Under Third Circuit L.A.R. 34.1(a) January 28, 2010

Before:   RENDELL and JORDAN, *Circuit Judges*, and
AMBROSE*, *District Judge*.

(Filed  July 13, 2010)
_____

John J. Pentz, III
Class Action Fairness Group
2 Clock Tower Place - Ste. 260G
Maynard, MA   01754
          *Counsel for Not Party-Appellant*


_____

    *Honorable Donetta W. Ambrose, United States District
Court Judge for the Western District of Pennsylvania, sitting
by designation.

Howard J. Bashman   [ARGUED in No. 08-2785]
2300 Computer Avenue - Ste. G-22
Willow Grove, PA   19090

George M. Plews
Christopher J. Braun
Plews Shadley Racher & Braun LLP
1346 N. Delaware Street
Indianapolis, IN   46202
        *Counsel for Objector-Appellant Susan M. Quinn*

Howard B. Becker
Steven A. Katz
Korein Tillery
505 N. 7th Street - Ste. 3600
St. Louis, MO   63101

Craig C. Corbitt
Zelle, Hofmann, Voelbel & Mason
44 Montgomery Street - Ste. 3400
San Francisco, CA   94104

Susan G. Kupfer
Glancy, Binkow & Goldberg
One Embarcadero Center - Ste. 760
San Francisco, CA   94111

John A. Maher
450 Springfield Avenue
Summit, NJ   07901

Joseph J. Tabacco, Jr.  [ARGUED in No. 08-2785]
Berman, DeValerio, Pease, Tabacco, Burt & Pucillo
425 California Street - Ste. 2100
San Francisco, CA   94104

William Bernstein
Eric B. Fastiff
Lieff, Cabraser, Heimann & Bernstein
275 Battery Street - 30th Fl.
San Francisco, CA 94111

Joseph D. Cooper
Tracy R. Kirkham
Cooper & Kirkham
357 Tehama Street - 2nd Fl.
San Francisco, CA   94103
*Counsel for Plaintiffs-Appellees Arrigotti Fine Jewelry
Shawn Sullivan and James Walnum*

Jessica Biggio
Francis Ciani-Dausch
Tara S. Emory
Matthew P. Hendrickson
Skadden, Arps, Slate, Meagher & Flom
4 Times Square
New York, NY 10036

Mark J. Sagat
Steven C. Sunshine
Skadden, Arps, Slate, Meagher & Flom
1440 New York Ave., N.W. - Rm. 08-08
Washington, DC   10005
        *Counsel for Defendant-Appellee DeBeers SA*

Edward W. Harris, III
Taft, Stettinius & Holister
One Indiana Square - Ste. 3500
Indianapolis, IN 46204

Robert A. Skirnick
Meredity, Cohen, Greenfogel & Skirnick
One Liberty Plaza - 35th Fl.
New York, NY 10006

Jared Stamell
Stamell & Schager
One Liberty Plaza -35th Fl.
New York, NY 10006
        *Counsel for Not Party-Appellees Anco Ind. Diamond*
        *Corp., Amer Diamond Tool & Gauge Inc. and British*
        *Diamond Import Co.*

Cecilia L. Gardner
Jewelers Vigilance Committee
25 West 45th Street - Ste. 1406
New York, NY   10035
        *Counsel for Not Party-Amicus Appellee Jewelers*
        *Vigilance Comm.*

6

Scott W. Browne
Browne & Browne
2380 Eastex Freeway
Beaumont, TX    77703

Kenneth E. Nelson
1100 Main Street - Ste. 2900
Kansas, City, MO    64105

Stuart C. Yoes
P.O. Drawer 7584
Beaumont, TX 77726

Edward F. Siegel
27600 Chagrin Blvd. - Ste. 340
Cleveland, OH    44122
        *Counsel for Not Party-Appellants William Benjamin*
        *Coffey, Jr., Marvin L. Union, Tim Henning, Neil*
        *Freeman and Kylie Luke*

Christpher A. Bandas
Bandas law Firm
500 North Shoreline - Ste. 1020
Corpus Christie, TX    78471
        *Counsel for Not Party-Appellant Aaron Petrus*

Robert E. Margulies
Margulies Wind
3 Second Street
Plaza 10, Ste. 1201
Jersey City, NJ    07311

Jeffrey L. Weinstein
518 E. Tyler Street
Athens, TX   75751
*Counsel for Not Party-Appellant Janet Giddings*

Ricky E. Bagolie
Bagolie Friedman Injury Lawyers
660 Newark Avenue
Jersey City, NJ   07306

Andrea Boggio
Bryant University
1150 Douglas Pike - Ste. F
Smithfield, RI   02917
*Counsel for Not Party-Appellants Frank Ascione,
Rosaura Bagolie, Matthew Delong, Sandeep Gopalan,
Manoj Kolel-Veetil, Matthew Metz, Anita Pal, Deb K.
Pal,Jay Pal, Ed McKenna, Peter Perera, Rangesh K.
Shah,and Thomas Vaughan*

Kristen Dishman
16 14th Avenue
Wareham, MA   02571
*Pro Se*

Margaret Marasco
14 Lakeview Avenue - #85
Lynn, MA   01904
*Pro Se*

James B. Hicks
Hicks Parks
824 Wilshire Blvd. - Ste. 200
Los Angeles, CA   90017
        *Pro Se*

————————————

OPINION OF THE COURT

————————————

JORDAN, *Circuit Judge*.

For more than one hundred years, De Beers S.A. and other entities within the De Beers family of companies (hereinafter collectively "De Beers") have fixed prices in the wholesale market for gem-quality diamonds through a web of pricing and output-purchase agreements with competitors. In the late 1990s, however, De Beers's market power began to wane as new suppliers entered the market and competitors refused to cooperate with De Beers's pricing efforts. Amidst these structural changes to the market, plaintiffs brought the present claims under §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, and under the antitrust, consumer protection, and unjust enrichment laws of all fifty states and the District of Columbia. Plaintiffs then entered into settlement negotiations with De Beers, which ultimately resulted in a proposed settlement that divided the plaintiffs into two putative classes and created a settlement fund of $295 million. Although several plaintiffs objected to the settlement, the United States District Court for the District of New Jersey overruled the objections, certified the two classes, and approved the settlement agreement. The

9

objectors then filed these appeals. For the reasons that follow, we will vacate the judgment of the District Court and remand for further proceedings.

## I.    Factual Background

Throughout the twentieth century, De Beers fixed prices in the market for rough gem-quality diamonds by, among other things, executing output-purchase agreements with competitors, establishing a market-wide cartel to set production limits, and restricting wholesalers from reselling diamonds outside of certain geographic territories. Wholesalers, known as "sightholders," were, and continue to be, screened by De Beers based on various criteria and are required to purchase diamonds at ten annual distribution events called "sights." Sightholders constitute De Beers's exclusive channel for distribution of its diamonds, and they resell those diamonds to jewelry manufacturers and retailers as rough diamonds, or as cut-and-polished stones, or as components of finished jewelry products.

### A.    *Deterioration Of De Beers's Market Power*

De Beers carried out its cartel activities – including distribution to sightholders – through the Central Selling Organization ("CSO"),[1] an entity established by De Beers for the purpose of coordinating its actions with those of its

---

[1] The CSO was originally formed in the mid-1920s and changed its name to the Diamond Trading Company ("DTC") in 2000.

competitors. Historically, the CSO was responsible for purchasing diamonds from De Beers's competitors, establishing pricing formulas, and setting output restrictions. The CSO's network of agreements and De Beers's status as founder of the CSO had for many years given De Beers nearly complete control over the market for rough gem diamonds.

That hold on the diamond industry began to slip, however, during the latter part of the twentieth century, and, by the mid-1990s, it was weakening fast. In 1993, Russia's state-controlled diamond company, ALROSA, flooded the market with low-quality gems to earn cash in the face of financial pressures on the government. In response, De Beers dropped the price of low-grade stones. That action prompted cartel-member Rio Tinto, which operates Argyle Diamond Mines of Australia ("Argyle"), to cease dealing with the CSO in 1996. Rio Tinto's Argyle mine, like ALROSA, began selling larger numbers of low-quality diamonds than De Beers had previously sold through the CSO.

With the low-end of the market moving beyond its control, De Beers turned its attention to higher-quality gems. It initially attempted to retain control over the production and sale of high-grade diamonds by purchasing its competitors' output, as it had done for many decades before. For example, in 1999, it entered into an output purchase agreement with competitor BHP Billiton ("BHP") under which it acquired 35% of BHP's total diamond production. That agreement ended in 2002, and again De Beers's efforts to maintain dominance began to fade, as the market for high-quality stones saw the entrance of new competitors and as old competitors brought new mines into

11

production. By 2006, in the overall market for rough gem diamonds, state-owned companies in Angola and the Democratic Republic of Congo collectively controlled 19% of global production; ALROSA controlled 17%, and De Beers controlled approximately 45%. Other competitors, including Rio Tinto, controlled the remaining share of the market.[2]

B. *Present Litigation*

The present case dates from 2001, when two price-fixing lawsuits were filed in the United States District Courts for the District of New Jersey and the Southern District of New York. Between 2002 and 2005, five additional lawsuits were filed in state and federal courts across the country, bringing the total number of suits against De Beers to seven. Three of the cases were initiated in state court in Arizona, California, and Illinois. The Illinois case was removed to federal court and was later consolidated with the remaining four lawsuits – all of which had been filed in various federal district courts – in the United States

---

[2]These statistics represent shares of the market for all rough gem diamonds, without regard to their quality. The parties have not indicated whether that market can be further segmented based on stone quality or whether suppliers of rough gem diamonds exercise similar measures of control in the market for cut-and-polished stones. A separate market also exists for industrial-grade diamonds, but that market is not pertinent to this appeal.

District Court for the District of New Jersey.[3]  While only the five federal cases are presently before us, all seven cases are pertinent to this set of appeals because the settlement agreement that the parties ultimately reached applied to all actions, including the ones in state court.

### 1.    *Identity of the Plaintiffs*

The plaintiffs in the seven cases can be divided into two categories, based on the claims that they assert.  The first category consists of direct purchasers that acquired rough gem diamonds directly from De Beers or one of its competitors.  The direct purchasers advanced claims of price-fixing and monopolization, citing §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, for which they sought damages and injunctive relief under §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.[4]

---

[3]All references to the "District Court" are to the United States District Court for the District of New Jersey.

[4]Sections 1 and 2 of the Sherman Act do not themselves create private rights of action.  Sections 4 and 16 of the Clayton Act authorize plaintiffs harmed by activity that violates §§ 1 and 2 to bring a suit for damages and injunctive relief.  *See Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) ("Although [plaintiff's] substantive claims arise under section 2 of the Sherman Act ... the private right of action is provided by section 4 of the Clayton Act, 15 U.S.C. § 15.").

The second category of plaintiffs consists of indirect purchasers, which are entities or individuals that acquired either rough or cut-and-polished gem diamonds but did not do so directly from De Beers or its competitors. Consumers and jewelry retailers fall into this category, as do middlemen who acquired diamonds from sightholders or from another indirect purchaser. The indirect purchasers sought recovery for the same antitrust injury as did the direct purchasers but brought their claims under state antitrust, consumer protection, and unjust enrichment law. These plaintiffs could only rely on state law as a route to monetary relief because they lack standing to bring a federal antitrust claim for damages under § 4 of the Clayton Act. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 735-36 (1977). They did, however, seek injunctive relief for those antitrust violations under § 16 of the Clayton Act. *See Mid-W. Paper Prods. Co. v. Cont'l Group*, 596 F.2d 573, 594 (3d Cir. 1979) ("*Illinois Brick* does not preclude indirect purchasers from suing for injunctive relief[,] and ... they have standing to sue under § 16 ... .").

Thus, these two categories of plaintiffs assert claims that overlap but are also distinct. The direct purchasers' claims for damages arise only under §§ 1 and 2 of the Sherman Act and § 4 of the Clayton Act. The indirect purchasers' damages claims implicate only state antitrust, consumer protection, and unjust enrichment law. Both categories of plaintiffs also assert claims under § 16 of the Clayton Act for injunctive relief against continued price-fixing and monopolization by De Beers.

14

## 2.    *De Beers's Participation in These Actions*

De Beers initially refused to appear in the lawsuits because it asserted that courts in the United States lacked personal jurisdiction over it and that any judgment entered by those courts would be a legal nullity. By September 2004, defaults or default judgments had been entered against De Beers in six of the seven actions. In May 2005, counsel for De Beers approached plaintiffs' counsel to discuss settlement of the indirect purchasers' claims. Those discussions produced a settlement of the indirect purchasers' claims in four of the cases (the "indirect purchaser settlement"). Under the indirect purchaser settlement, De Beers agreed not to contest certification of a settlement class of indirect purchasers, and further agreed to establish a settlement fund of $250 million to be paid to class members. De Beers also agreed to a stipulated injunction that restrained it from violating U.S. antitrust law, and it consented to the District Court's jurisdiction for the purpose of enforcing the injunction.

On November 30, 2005, the District Court entered an order (the "November 30 order") that preliminarily approved the settlement agreement and conditionally certified a settlement class of indirect purchasers under Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.[5] Rule 23(b)(2) allows

---

[5]Prior to 2003, Rule 23 expressly authorized district courts to conditionally certify a class. *See* FED. R. CIV. P. 23(c)(1) (2002) (providing that a class certification order "may be conditional, and may be altered or amended before the decision on the

15

a court to certify a class that seeks "final injunctive relief ... respecting the class as a whole," FED. R. CIV. P. 23(b)(2), whereas Rule 23(b)(3) authorizes certification when "questions of law or fact common to class members predominate over any questions affecting only individual members," FED. R. CIV. P. 23(b)(3). Hence, the Court preliminarily approved the class under Rule 23(b)(2) for the purpose of entering the stipulated injunction and likewise approved the same class under Rule 23(b)(3) in order to distribute the proceeds of the settlement fund.

De Beers then entered into settlement negotiations with the direct purchasers and ultimately reached a settlement agreement with them in March 2006. That agreement mirrored the indirect purchaser settlement: De Beers agreed not to contest certification of a direct purchaser settlement class and to create a fund of $22.5 million to satisfy class members' Sherman Act claims. De Beers also agreed to increase the indirect purchaser class settlement fund by $22.5 million because the lawsuits filed by the direct purchasers included as plaintiffs some indirect purchasers who had not participated in

merits.") In 2003, however, the provision allowing for conditional certification was removed because "[a] court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met." FED. R. CIV. P. 23 (2010) advisory committee's note to the 2003 amendments. However, as none of the parties challenge the District Court's certification order on the basis of that change, we will not discuss it further.

16

the earlier settlement. Finally, De Beers agreed to injunctive relief that was substantively identical to that imposed under the indirect purchaser settlement.

On March 31, 2006, the District Court amended its November 30 order to conditionally certify both the direct and indirect purchaser settlement classes under Rules 23(b)(2) and 23(b)(3), and to preliminarily approve a combined settlement for both classes. The proposed combined settlement agreement provided for a fund of $295 million to be paid to both the direct and indirect purchaser classes. The direct purchasers were to receive $22.5 million of the fund, while $272.5 million was allotted to the indirect purchaser claims. The combined settlement also provided for entry of a stipulated injunction that, among other things, required De Beers to comply with all federal and state antitrust laws, limited De Beers's ability to purchase diamonds from third-party producers, and prohibited De Beers from restricting the geographic territory within which sightholders could resell De Beers diamonds. De Beers also agreed to subject itself to personal jurisdiction in the United States for enforcement of the combined settlement agreement. The parties stipulated that the injunction would take effect in April 2006 even though, at that time, the Court had not yet entered a final order certifying the class and approving the settlement agreement.

C.     *Class Certification And Settlement Proceedings*

After preliminarily approving the new settlement agreement, the District Court allowed class members to lodge

objections to the class certification and the settlement.[6]  Class objectors filed a total of thirty-four objections.  All objections pertained to the proposed certification of, and recovery by, the indirect purchaser class; none of the direct purchasers objected to the settlement.

The objectors raised two challenges to the propriety of certifying the two settlement classes.  First, they argued that a nationwide class of indirect purchasers should not have been certified for the purpose of administering a monetary settlement of state law claims because antitrust, consumer protection, and unjust enrichment laws vary widely from state to state.[7]  According to the objectors, those differences are of such magnitude that common questions of law or fact do not predominate with regard to the indirect purchaser class, thus making certification inappropriate under Rule 23(b)(3). Second, the objectors asserted that a nationwide class of both direct and

---

[6]The District Court referred the case to a special master for the purpose of recommending a distribution plan for the indirect purchaser settlement award and for evaluating a fee request filed by plaintiffs' counsel.  As we conclude that the Court improperly certified the indirect purchaser class, *see infra* Part III.A, the objections to the distribution plan and fee award are moot, and we need not recount the special master's recommendation on those matters.

[7]The objectors did not oppose certification of the direct purchaser class for the purpose of adjudicating Sherman Act claims.

indirect purchasers should not have been certified for the purpose of implementing injunctive relief because the market for rough gem diamonds became competitive during the pendency of this litigation. That competitive increase, they say, rendered an injunction to enforce compliance with antitrust statutes unnecessary and accordingly divested the indirect purchasers of antitrust standing to seek relief under Rule 23(b)(2).

The District Court overruled both objections. Regarding Rule 23(b)(3) certification, the Court concluded that, while antitrust and consumer protection statutes vary from state to state, those differences are not so significant that they override class commonalities. Specifically, the Court held that class members share common issues of fact regarding whether De Beers actually fixed the price of rough gem diamonds and whether such price-fixing caused the plaintiffs to suffer an antitrust injury. The Court further noted that "De Beers ... demanded a release of potential damage claims in all 50 states" as a condition of the settlement and that certification of a nationwide class was therefore appropriate, even though the law of many jurisdictions limits or denies the right of indirect purchasers to recover for antitrust injuries. (App. at 279.) The Court also observed that the alleged harm was national in scope and that resolving all federal and state antitrust claims simultaneously "benefit[ed] all class members by spreading litigation costs among Plaintiffs." (App. at 284.)

With respect to the Rule 23(b)(2) injunctive relief, the Court held, without addressing objectors' description of competitive advances in the market, that "all class members will

continue to suffer ... harm."  (App. at 285.)  The Court rejected the objectors' argument that the class lacked antitrust standing, concluding that De Beers had stipulated as a factual matter that its conduct caused antitrust injury to all members of the direct and indirect purchaser classes.  Thus, according to the Court, De Beers's concession provided a factual basis upon which to predicate class members' antitrust standing because "De Beers has waived the right to demand proof of the substantive elements of the [antitrust] claims."  (*Id.*)

Accordingly, on May 22, 2008, the Court entered a final order certifying the direct and indirect purchaser classes under Rules 23(b)(2) and 23(b)(3).  As ultimately certified, the direct purchaser class includes all sightholders who acquired rough gem diamonds directly from De Beers between September 20, 1997 and March 31, 2006.  The indirect purchaser class includes all indirect purchasers who acquired gem diamonds between January 1, 1994 and March 31, 2006, regardless of whether their stones were supplied by De Beers or by one of its competitors.[8]  Also on May 22, 2008, the Court entered a previously agreed-upon injunction.  The injunction is framed to remain in effect for five years from its date of issuance, thus expiring on May 22, 2013.  The objectors then filed the present appeals.

---

[8]The parties have not explained, nor does the record reveal, why the indirect purchaser class reaches back to 1994, but the direct purchaser class dates only from 1997.  Whatever the reasons may be for this disparity, no one has suggested that they are pertinent to the present appeals.

20

## II.    Jurisdiction And Standard Of Review

The District Court possessed federal question jurisdiction over the direct purchasers' Sherman Act antitrust claim for damages pursuant to § 4(a) of the Clayton Act, 15 U.S.C. § 15(a), and over both the direct and indirect purchasers' claims for injunctive relief under § 16 of that Act, 15 U.S.C. § 26. Original jurisdiction over the federal claims also arose under 28 U.S.C. §§ 1331 and 1337(a). The District Court had supplemental jurisdiction over the indirect purchasers' state-law antitrust, consumer protection, and unjust enrichment claims under 28 U.S.C. § 1367. We have jurisdiction to review final orders of the District Court pursuant to 28 U.S.C. § 1291.

We review an order granting class certification for abuse of discretion. *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 595 (3d Cir. 2009). A district court abuses its discretion when its class certification decision "rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Id.* (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2008)).

## III.   Discussion

The appellants are objectors who challenged the District Court's order certifying the indirect purchaser class under Rule 23(b)(3) and both classes under Rule 23(b)(2). The appellees

are the named representatives of the indirect purchaser class, who of course support the District Court's order.[9]

A district court may certify a lawsuit as a class action if the suit meets the requirements of Rules 23(a) and 23(b). Rule 23(a) mandates first, that the class be so numerous that joinder of all members is impracticable, second, that the class share common questions of law or fact, third, that the class representatives possess claims or defenses that are typical of all class members, and fourth, that the class representatives be able to fairly and adequately represent the class interests. FED. R. CIV. P. 23(a). If those requirements are satisfied, a district court may certify the class for one of the purposes enumerated in Rule 23(b). As previously noted, Rule 23(b)(2) permits class

---

[9]On June 11, 2009, plaintiffs filed a motion to dismiss the appeal on the grounds that the objectors lack standing to appeal the Rule 23(b)(2) certification order because the injunction restrains only De Beers, not the objectors. We reject that argument. An unnamed class member has standing to appeal a class certification order provided that the member objected to the settlement and is bound by the court's judgment. *Devlin v. Scardelletti*, 536 U.S. 1, 7-10 (2002); *accord Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1307-10 (3d Cir. 1993). In this case, the objectors contested certification before the District Court. As class members, they are bound by the Court's judgment and by the terms of the settlement agreement, which release De Beers from antitrust liability. The objectors therefore have standing to pursue appeals, and we will enter a separate order denying the motion to dismiss.

22

certification if the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief ... is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). Again, as already noted, Rule 23(b)(3) permits certification whenever "questions of law or fact common to class members predominate over any questions affecting only individual members, and ... a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). The District Court must specify which provision of Rule 23(b) supports certification of the class. *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 309 (3d Cir. 1998).

In this case, the objectors challenge the propriety of certification under either Rule 23(b)(2) or 23(b)(3). Because the Court's Rule 23(b)(3) certification order presents a broader range of issues than its Rule 23(b)(2) counterpart, we address the certification of the damages class before turning to the class claims for injunctive relief.

A.      *Certification Under Rule 23(b)(3)*

Because Rule 23(b)(3) allows a district court to certify a class only if, first, all class members share common questions of law or fact that predominate over other issues in the case, and, second, a class action is superior to other methods of adjudicating the members' claims, courts have come to refer to these twin prerequisites for certification as the "predominance" requirement and the "superiority" requirement. The predominance requirement is similar to the commonality requirement in Rule 23(a)(2), which says that the class must

23

share common questions of law or fact. However, the question of predominance imposes a more stringent obligation on the reviewing court to ensure that issues common to the class truly overshadow those pertinent to individuals or to subgroups of class members. *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 266 (3d Cir. 2009). It is therefore "appropriate to analyze the [commonality and predominance] factors together, with particular focus on the predominance requirement." *Id.* (internal quotation omitted).

A district court must evaluate predominance and superiority by considering the following four factors enumerated in Rule 23(b)(3):

> (A)  the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B)  the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C)  the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D)  the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b)(3). The court may also consider additional factors pertinent to class certification issues. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615-16 (1997)

24

(describing factors listed in Rule 23(b)(3) as "nonexhaustive"). When presented with a motion to certify a class for settlement purposes only, as in this case, the court need not consider the likely difficulties associated with managing the class action through trial. *Id.* at 620. Regardless of the purposes for which class certification is sought, though, the court is not required to rest its certification order solely upon the pleadings. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 316 (3d Cir. 2008) ("[T]he requirements set out in Rule 23 are not mere pleading rules."). Instead, the court should perform a "rigorous analysis" that "delve[s] beyond the pleadings to determine whether the requirements for class certification are satisfied." *Id.* (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 167 (3d Cir. 2001)).

The only issue under Rule 23(b)(3) that the objectors challenge on appeal is the District Court's finding of predominance with regard to the state law claims against De Beers. The predominance of an issue depends upon the value that addressing it will yield for all class members. *Amchem*, 521 U.S. at 623 (indicating that the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation"). The issue need not be dispositive of the case, *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 29 (D.D.C. 2001), but it must be significant to every class member's claim. *See* 2 ALBA CONTE & HERBERT NEWBERG, NEWBERG ON CLASS ACTIONS, § 4:25, at 173 (4th ed. 2002) (recounting that courts have described as predominant those issues which present a "common nucleus of fact," an "overriding question," or an "essential common link among class members"). Issues are not predominant if they are

25

common to all class members but their resolution does little to bring the case to conclusion. *Cf.* Fed. R. Civ. P. 23(b)(3) advisory committee's note to the 1966 amendment (indicating that common issues will not predominate if an individualized assessment of liability is necessary notwithstanding resolution of them). Thus, the predominance inquiry requires the court to identify class members' claims and to ask whether the class can support any of the elements of those claims through common proof. *Simer v. Rios*, 661 F.2d 655, 672 (7th Cir. 1981)*; cf. Ins. Brokerage*, 579 F.3d at 269 (affirming class certification because plaintiffs possessed class-wide proof of antitrust injury, even though the amount of each members' damages required individualized proof).

The District Court found that the shared antitrust harm sustained by all indirect purchasers predominated over other issues in the case, making those claims appropriate for class treatment. Thus, the District Court's certification order grouped antitrust claims under the laws of all fifty states and the District of Columbia into a single class. The objectors challenge the District Court's finding of predominance, arguing that differences in state law prevent the allegedly common harm associated with De Beers's price fixing from gaining predominance over legal issues shared by only limited segments of the class. More specifically, the objectors say that different states have very different laws governing whether indirect purchasers even have an antitrust claim and that those substantive differences in state law prevent common issues of law and fact from predominating in this case. They likewise argue that differences among state consumer protection and unjust enrichment laws prevent a finding of predominance.

Finally, they argue that the District Court's certification order is procedurally improper because the order fails to identify the state law claims that will receive class treatment.   We take up each of those contentions in turn.

## 1.  *Predominance of Common Legal and Factual Questions*

The objectors' primary attack on the class certification and settlement order asserts that variations in state antitrust statutes prevent common class issues from gaining predominance over individual legal issues.  We have recognized that "there may be situations where variations in state laws are so significant so as to defeat commonality and predominance even in a settlement class certification." *In re Warfarin Sodium Antitrust Litig.* (*Warfarin Sodium II*), 391 F.3d 516, 524, 529-30 (3d Cir. 2004) (certifying a class of consumer deception claims under the law of all fifty states while recognizing that the entire class also shared a single, common deception claim under the law of Delaware, where the allegedly deceptive communications had originated).  However, neither we nor our sister courts of appeals have considered whether variations among state antitrust statutes are so far-reaching that those differences overshadow commonalities when a class of indirect purchasers seeks certification on a nationwide basis.  We must therefore consider for the first time whether a national class of indirect purchaser claimants under state law is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.

27

a. *State Antitrust Statutes*

Under the Sherman Act, to establish antitrust liability for horizontal price-fixing, a plaintiff must show that (1) a defendant entered a contract, combination, or conspiracy with at least one other entity; (2) the agreement constitutes an unreasonable restraint of trade; (3) the agreement produced anticompetitive effects in the relevant market; and (4) the plaintiff was injured as a result. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 442 (3d Cir. 1997) (reiterating elements of proof under § 1 of the Sherman Act). A claim for monopolization requires the plaintiff to prove that (1) the defendant possesses "monopoly power in the relevant market" and (2) the defendant acquired, maintained, or attempted to acquire or maintain that power through means other than "growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (setting forth the elements of proof under § 2 of the Sherman Act). Many states have enacted antitrust statutes that proscribe the same conduct as the Sherman Act. 14 HERBERT HOVENKAMP, ANTITRUST LAW ¶ 2401a, at 314 (2d ed. 2006).

While state antitrust statutes frequently track the Sherman Act in terms of their substantive elements of proof, they vary significantly with regard to the standing that they extend to indirect purchasers. The variance is mainly a function of whether a state has chosen to follow the Sherman Act principles regarding standing laid down by the Supreme Court in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). In that case, the Court decided that only direct purchasers of a product or service

28

may sue for an antitrust injury. *Id.* at 734-36. The Supreme Court's theory for denying standing to indirect purchasers was that "the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it." *Id.* at 735. Hence, the Court viewed direct purchaser standing as the most efficient way to ensure that companies or individuals engaging in anticompetitive conduct were called to account for their actions. *Id.* at 741.

Some states have elected to follow the Supreme Court's lead in *Illinois Brick*. *See, e.g.*, *Wilson v. Gen. Motors Corp.*, 921 A.2d 414, 416-17 (N.J. 2007); *Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 798 (Ohio 2005); *Major v. Microsoft Corp.*, 60 P.3d 511, 513 (Okla. Civ. App. 2002). Other states, however, have diverged from *Illinois Brick* and have enacted statutes known as "*Illinois Brick* repealers." Those statutes reject the rule that antitrust recovery is limited to parties that dealt directly with the defendant and instead extend antitrust standing to indirect purchasers, including consumers. *See, e.g.*, CAL. BUS. & PROF. CODE § 16750(a); MICH. COMP. LAWS § 445.778(2); N.Y. GEN. BUS. LAW § 340(6). Finally, a third set of jurisdictions allow indirect purchasers to seek antitrust recovery, but only if the state joins the suit in a *parens patriae* capacity. *See* IDAHO CODE §§ 48-108(2), -113(1); *Siena v. Microsoft Corp.*, 796 A.2d 461, 464-65 (R.I. 2002).

Thus, in some states with *Illinois Brick* repealers, indirect purchasers may personally advance a claim for antitrust recovery against a defendant, such as De Beers, that has fixed prices. In

29

other states, however, they may do so only with the assent of the state attorney general. And in states without a repealer statute, recovery is usually foreclosed entirely.[10] At least twenty-five states and the District of Columbia have implemented *Illinois Brick* repealers or extended antitrust standing to indirect purchasers through judicial decision; the remaining states have not.[11]

---

[10]Standing in those states is ordinarily but not always foreclosed. The following states lack *Illinois Brick* repealers but have extended indirect purchaser standing through judicial decisions:

> Arizona (*Bunker's Glass Co. v. Pilkington PLC*, 75 P.3d 99, 109 (Ariz. 2003) (en banc))
>
> Iowa (*Comes v. Microsoft Corp.*, 646 N.W.2d 440, 449-50 (Iowa 2002))
>
> North Carolina (*Hyde v. Abbott Labs., Inc.*, 473 S.E.2d 680, 687 (N.C. Ct. App. 1996))
>
> Tennessee (*Sherwood v. Microsoft Corp.*, No. M2000-01850-COA-R9-CV, 2003 WL 21780975, *16 (Tenn. Ct. App. July 31, 2003)).

[11]The following states and territories have enacted *Illinois Brick* repealers that allow indirect purchasers to bring private suits for damages:

> Alabama (ALA. CODE § 6-5-60(a))
> California (CAL. BUS. & PROF. CODE § 16750(a))

In short, this is not a case in which a class of plaintiffs

---

District of Columbia (D.C. CODE § 28-4509(a))
Guam (Guam Code Ann. tit. 9, § 69.30(a))
Hawaii (HAW. REV. STAT. § 480-3)
Illinois (740 ILL. COMP. STAT. 10/7(2))
Kansas (KAN. STAT. § 50-161(b))
Maine (ME. REV. STAT. tit. 10, § 1104(1))
Michigan (MICH. COMP. LAWS § 445.778(2))
Minnesota (MINN. STAT. § 325D.57)
Mississippi (MISS. CODE § 75-21-9)
Nevada (NEV. REV. STAT § 598A.210(2))
New Hampshire (N.H. REV. STAT. § 356:11(II)).
New Mexico (N.M. STAT. § 57-1-3(A))
New York (N.Y. GEN. BUS. LAW § 340(6))
North Dakota (N.D. CENT. CODE § 51-08.1-08(3))
Oregon (OR. REV. STAT. §646.780(1)(a))
South Dakota (S.D. CODIFIED LAWS § 37-1-33)
Utah (UTAH CODE ANN. § 76-10-919(1)(a))
Vermont  (VT. STAT. tit. 9, § 2465)
Wisconsin (WIS. STAT. § 133.18(1)(a)).

The following states allow indirect purchaser recovery, but only in *parens patriae* suits brought by the state attorney general:

Alaska (ALASKA STAT. § 45.50.577(b))
Arkansas (ARK. CODE ANN. § 4-75-315(b))
Idaho (IDAHO CODE § 48-108(2))
Rhode Island (R.I. GEN. LAWS § 6-36-12(a), (g))
Virginia (VA. CODE ANN. § 59.1-9.15(d)).

possesses numerous disparate claims but shares an overriding common cause of action under a common body of law. Instead, all parties agree that the claims within the indirect purchaser class implicate the law in every jurisdiction in the nation and that no jurisdiction provides a claim shared by all, or even by a majority, of the class members. These variations in state antitrust law are not trivial.[12] They represent fundamental policy differences among the several states, and they are in consequence as different as it is possible to be, with some states giving substantive antitrust rights to indirect purchasers, other states giving more limited rights, and others denying such rights altogether.

---

[12]Our concurring colleague says we have "attempted to address the specific nuances of the substantive laws of the fifty states." (Concurring at 12 (internal quotation marks omitted).) That is a misapprehension. We are certainly not saying that nuanced differences among state laws will prevent the certification of a class, nor are we suggesting that a state-by-state cataloguing of differences in state law is necessary every time a multi-jurisdiction class is certified. We are saying that the difference between having an antitrust claim under state law and having none is no mere nuance and cannot be solved by any reconfiguration of the nationwide class short of changing it from a nationwide class to one or more classes that exclude those who have no claim. The concurrence acknowledges this necessity by saying that, "[i]f ... neither state nor federal law provides a New Jersey resident with a right to relief, then the class should be redefined so that it does not include persons whose right to relief is governed by New Jersey law." (*Id.*)

For example, an indirect purchaser located in a state that has an *Illinois Brick* repealer, such as New York, may sue and recover for a price-fixing or monopolization harm, *see* N.Y. GEN. BUS. LAW § 340(6), but an identical indirect purchaser in a neighboring state without a repealer, such as New Jersey, may not, *see Sickles v. Cabot Corp.*, 877 A.2d 267, 276 (N.J. Super. Ct. App. Div. 2005) (refusing to extend antitrust liability under the New Jersey Antitrust Act to indirect purchasers). It is hard to imagine a greater disparity between two class members. Whereas the New York purchaser may recover for an antitrust violation if he can prove the existence of a price-fixing agreement or monopoly market power resulting in higher prices, the New Jersey purchaser has no legal right to recover – or even to bring a lawsuit – regardless of whether he can conclusively prove the existence of a restraint and antitrust impact. Thus, while both purchasers may have felt the effects of the same antitrust conduct, the purchasers do not share common legal or factual issues because the antitrust activity gives rise to a right of action for only one purchaser. *See Ins. Brokerage*, 579 F.3d at 266 (noting that Rule 23 requires that a class possess at least one issue of law or fact that affects all class members' claims). The natural result of those differences is that there can be no certification of a nationwide class of state indirect purchaser plaintiffs because there is no common question of law or material fact. It is improper to certify a nationwide class when the legal right shared by class members purportedly arises under the laws of multiple jurisdictions, but only some of those

33

jurisdictions extend standing to class members to enforce that right.[13]

Plaintiffs seek to minimize these legal disparities by characterizing them as little more than impediments to litigation that would make trial management difficult but that may safely be ignored for settlement purposes. That argument places management issues above the more basic question of substantive law. It is akin to suggesting that a really good cook, by means of superior kitchen management, can make a cake out of nothing. The lack of substantive rights cannot be wished away by the promise of easier litigation management. Proponents of class certification for any purpose, including settlement, retain the burden of demonstrating that all class members share

_____

[13]Again, we are not suggesting that a district court must conduct a state-by-state analysis every time there exists some difference in the state law underlying class members' claims. However, when the parties propose to use class certification mechanisms in a manner that materially changes substantive rights, the district court has a duty to ensure that such use does not create a right of recovery where none existed before. *See Hydrogen Peroxide*, 552 F.3d at 320 (imposing on district courts the obligation to ensure that the plaintiffs have satisfied their burden under Rule 23 before certifying a class). Hence, district courts must remain attuned to the kind of significant variations in state law at issue here and reject proposed classes that allow plaintiffs to recover damages through the class certification procedure when they would be unable to do so in an individual action.

common legal or factual issues and that those issues predominate over matters requiring individual proof. *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 799 (3d Cir. 1995) (holding that nothing in Rule 23 "can be read to authorize separate, liberalized criteria for settlement classes"). That test presupposes that everyone in the class at least has a cause of action. The variations in state law identified by the objectors preclude the requisite finding of predominance under Rule 23(b)(3) because indirect purchasers do not have a right to recover in all states, and, therefore, no question of law or fact regarding their legal rights is uniform throughout the class. *Cf. Prudential*, 148 F.3d at 315 (stating that certification of a nationwide class of state-law claims is appropriate if the plaintiffs possess similar rights under the laws of all states such that the court can readily control for differences among various jurisdictions).

The predominance requirement of Rule 23 is not the only statutory provision to stand as an obstacle to certification. As just discussed, the District Court's certification order extends antitrust remedies that, in many instances, have no root in state substantive law. As such, the order contravenes the Rules Enabling Act, which prohibits a court from interpreting procedural rules in a manner that creates new substantive rights. *See* 28 U.S.C. § 2072(b) (stating that federal courts may not interpret procedural rules in a manner that "enlarge[s] ... any substantive right"); *see also Windham v. Am. Brands, Inc.*, 565 F.2d 59, 65-66 (4th Cir. 1977) (cautioning that each plaintiff in a federal antitrust action must offer individual proof of damages and that the failure to require such proof contravenes the Rules Enabling Act by allowing a plaintiff to recover in the absence of

35

individual harm). By certifying a class, the District Court ran afoul of the Act because its order effectively granted relief to individuals to whom De Beers had no antitrust liability.

Nor can these foundational problems be overcome, as plaintiffs suggest, by relying upon De Beers's willingness to stipulate to liability in all fifty states. Plaintiffs argue that "[w]hen a settlement is reached, the defendant elects not to contest the allegations of the complaint, and district courts are entitled to rely on those allegations to demonstrate commonality." (Plaintiff-Appellees' Ans. Br. at 46.) That is simply incorrect. Independent of any stipulations, district courts are obligated "to consider carefully all relevant evidence and make a definitive determination that the requirements of Rule 23 have been met before certifying a class." *Hydrogen Peroxide*, 552 F.3d at 320. Were it otherwise, the door would swing wide to collusive settlements. *Amchem*, 521 U.S. at 620 (requiring courts to exercise "undiluted, even heightened, attention" to issues of commonality and predominance in the settlement context because those inquires are designed "to protect absentees by blocking unwarranted or overbroad class definitions"). Thus, plaintiffs and De Beers cannot salvage an improper certification order by saying that De Beers has stipulated out of existence defects in the commonality and predominance of the class claims.

The objections in this case pertain to the predominance of class claims and to the standing of individual class members to bring claims under state law. The District Court had to consider both of those issues, apart from the pleadings and stipulations, when evaluating the motion to certify a class.

36

*Hydrogen Peroxide*, 552 F.3d at 316. A defendant's decision not to contest the requirements of Rule 23 does not relieve a district court of its independent obligation to ensure that those requirements are satisfied. The District Court did not adequately satisfy that obligation and abused its discretion in finding that common issues of law or fact predominate so as to warrant certification of a nationwide class of state antitrust claims.

> b.  *State Consumer Protection and Unjust Enrichment Law*

A similar problem exists with regard to the District Court's certification of consumer protection and unjust enrichment claims for class-wide treatment. Consumer protection and unjust enrichment laws are no more uniform among the fifty states than are antitrust statutes. In fact, they are less so. Some states without *Illinois Brick* repealers allow indirect purchasers to invoke consumer protection statutes to gain antitrust relief. *See, e.g.*, *Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 107 (Fla. Dist. Ct. App. 1996); *Ciardi v. F. Hoffmann-La Roche, Ltd.*, 762 N.E.2d 303, 312 (Mass. 2002); *Arthur v. Microsoft Corp.*, 676 N.W.2d 29, 37-38 (Neb. 2004). Other states preclude indirect purchasers from doing so because they have adopted *Illinois Brick* standing requirements and view any utilization of consumer protection statutes to recover for antitrust harm as circumventing that policy decision. *See, e.g.*, *Sickles*, 877 A.2d at 277; *Major*, 60 P.2d at 517; *Vacco v. Microsoft*, 793 A.2d 1048, 1064-66 (Conn. 2002); *Blewett v. Abbott Labs.*, 938 P.2d 842, 844 (Wash. Ct. App. 1997). A third group requires indirect purchaser consumer protection actions to proceed as *parens patriae* suits. *Blewett*, 938 P.2d at 847,

while other statutes lack such requirements, *see, e.g.*, D.C. CODE § 28-4509(a); MICH. COMP. LAWS § 445.778(2); N.D. CENT. CODE § 51-08.1-08(3).

The common law of unjust enrichment likewise varies among the states, with some jurisdictions mandating proof of elements not required by others. Evidence of antitrust activity may provide a basis for an unjust enrichment claim in some states. *See Freeman Indus. LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 524-26 (Tenn. 2005) (allowing an indirect purchaser price-fixing claim to proceed under an unjust enrichment theory); *see also D.R. Ward Constr. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485, 507-08 (E.D. Pa. 2006) (same with respect to Arizona law). Other states preclude recovery for antitrust injuries on an unjust enrichment theory. *Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1018 (N.Y. 2007); *cf. Coastal Envt'l. Specialists, Inc. v. Chem-Lig Int'l, Inc.*, 818 So. 2d 12, 19 (La. Ct. App. 2001) (holding that a plaintiff may not invoke unjust enrichment principles to obtain a remedy for a harm that is adequately redressed by other areas of law). With respect to the substantive elements of unjust enrichment, some states require plaintiffs to prove that the defendant's conduct rises to the level of fraud. *See Mantiply v. Mantiply*, 951 So.2d 638, 655 (Ala. 2006); *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). Others do not. *See Rhue v. Rhue*, 658 S.E.2d 52, 59 (N.C. Ct. App. 2008); *Anderson v. DeLisle*, 352 N.W.2d 794, 796 (Minn. Ct. App. 1984). Some allow an unjust enrichment claim only if the plaintiff has no adequate remedy at law. *Harris Group, Inc. v. Robinson*, 209 P.3d 1188, 1205 (Colo. Ct. App. 2009); *Harvell v. Goodyear Tire & Rubber Co.*, 164 P.3d 1028, 1035 (Okla.

38

2006). Others lack that requirement. *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009); *Williams Twp. Bd. of Supervisors v. Williams Twp. Emerg. Co., Inc.*, 986 A.2d 914, 923 (Pa. Commw. Ct. 2009). In short, "the claim of unjust enrichment is packed with individual issues" and therefore precludes a finding of predominance in this nationwide class action context. *Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 501 (S.D. Ill. 1999).

Amidst the welter of differing statutes and decisions across the country on these issues, at least one thing emerges clearly: evidence of price-fixing and monopolization does not give rise in every state to an unjust enrichment or consumer protection claim for indirect purchasers. Thus, while De Beers's price-control activity, as a practical matter, may have harmed all indirect purchasers, that injury cannot provide a basis for the certification granted here because it does not give rise to a legal right to recovery in all of the jurisdictions implicated by a nationwide class. *See Chiang v. Veneman*, 385 F.3d 256, 273 (3d Cir. 2004) ("In order to predominate, the common issues must constitute a 'significant part' of the individual cases." (quoting *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (3d Cir. 1986))). The District Court therefore abused its discretion when it found that consumer protection and unjust enrichment laws were sufficiently similar to warrant certification as a class.[14] *Cf. Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742,

---

[14]It is inapposite to say, as does our concurring colleague, that every plaintiff "might have *some* valid claim" in addition to an antitrust or consumer protection action and that such claims

746-48 (7th Cir. 2008) (reversing class certification order in a consumer deception case because, while all consumers had purchased the alleged deceptively marketed product, differences among state law precluded a finding of common legal issues).

### c.     Federalism Concerns

It is no mere afterthought to note that, even ignoring the obstacles posed by Rule 23, principles of federalism counsel against certifying a class in this matter. The mandate of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938), prevents a district court from invoking federal procedural rules to extend recovery to a state law plaintiff when state courts would not recognize the plaintiff's harm as grounds for relief. *Montgomery Ward & Co., Inc. v. Pac. Indem. Co.*, 557 F.2d 51, 56 n.8 (3d Cir. 1977) ("In giving federal courts 'cognizance' of equity suits in cases of diversity jurisdiction, Congress never gave, nor did the federal courts ever claim[,] the power to deny substantive rights created by State law or to create substantive rights denied by State law."). Thus, a district court abuses its

---

might be susceptible to common elements of proof. (Concurrence at 13 (emphasis in original).) That is pure speculation, for, if such claims exist, the plaintiffs did not bring them. Every claim alleged in the complaints seeks recovery for price-fixing and monopolization by De Beers. The claims themselves are brought under a variety of statutory labels, but at their core they all seek damages flowing from De Beers's antitrust conduct, which is categorically foreclosed to indirect purchasers in many states without *Illinois Brick* repealers.

40

discretion when, as happened here, it approves a settlement based on a supposed state law antitrust violation that the plaintiff could not have asserted in state court.

Sacrificing the principles of federalism to obtain the benefits of a settlement is a poor trade. Certain states have categorically refused to allow indirect purchasers to bring a price-fixing claim as a matter of substantive law. *E.g., Wilson*, 921 A.2d at 416-17; *Johnson*, 834 N.E.2d at 798; *Major*, 60 P.3d at 513; *Abbott Labs., Inc. (Ross Labs. Div.) v. Segura*, 907 S.W.2d 503, 507 (Tex. 1995). The policy decisions of those states are "fundamental aspect[s] of our federal republic and must not be overridden in a quest to clear the queue in court." *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1020 (7th Cir. 2002). By allowing the indirect purchasers to effectuate a settlement without regard to those policy decisions, the District Court wrongly allowed the sovereignty of the states to be subordinated to De Beer's desire to resolve all indirect purchaser claims simultaneously.

Our holding today is not a repudiation of all nationwide class actions based upon state law. In fact, we have previously approved the use of class litigation as a means of resolving state law claims, recognizing that in certain cases such certification may be entirely proper. *See Warfarin Sodium II*, 391 F.3d at 529-30 (certifying a nationwide class under state consumer protection statutes on the basis that class members had uniformly been overcharged for the defendant's product and had

41

a right to recover under the law of all fifty states).[15] Nor are we

---

[15]Plaintiffs argue that *Warfarin Sodium II* compels us to uphold the District Court's certification order, and our concurring colleague believes that we "dismiss[] out of hand" the controlling effect of that decision. (Concurring Op. at 1.) Not so, though we evidently do view that case differently. In *Warfarin Sodium II*, a nationwide class of plaintiffs sued DuPont Pharmaceuticals Company for deceptive advertising after DuPont claimed that Coumadin, an anticoagulation drug, produced certain benefits not associated with the generic form marketed by its competitors. 391 F.3d at 522-24. Plaintiffs, including indirect purchasers of Coumadin, brought claims for monopolization under § 2 of the Sherman Act, the consumer protection laws of all fifty states and the District of Columbia, and the state antitrust statutes in states with *Illinois Brick* repealers. *Id.* at 524 & n.8. All class members also advanced a claim under the Delaware Consumer Fraud Act, DEL. CODE tit. 6, § 2513, on the ground that the allegedly deceptive communications originated from DuPont's Delaware-based headquarters. *Warfarin Sodium II*, 391 F.3d at 528. The District Court approved a settlement class, which we upheld on appeal over the protests of an objector who argued that variations among state consumer protection statutes defeated predominance. *Id.* at 529-30.

*Warfarin Sodium II* is not controlling because the plaintiffs in that case shared a common claim under the Delaware Consumer Fraud Act. *Id.* at 528. Evidence pertaining to DuPont's distribution of deceptive marketing materials was common to all class members, and all class members suffered a

42

similar harm by purchasing Coumadin under false pretenses. *Id.* Thus, unlike the plaintiffs in this case, the plaintiffs in *Warfarin Sodium II* shared a single, common claim that gave rise to an identical right to recovery under a single state statute for every member of the class. The same evidence used to support this class-wide claim was also relevant to the consumer protection claims under the laws of other states, making class issues predominant over individual ones.

The nationwide consumer protection claims certified in *Warfarin Sodium II* are critically different than the antitrust claims in this case because they were founded upon deceptive marketing practices, which were properly cognizable under the laws of all fifty states. *See id.* at 529-30 (implying that certification was proper for settlement purposes because the law in all fifty states provided some form of relief for DuPont's deceptive marketing practices). In contrast, many states do not permit plaintiffs to invoke consumer protection remedies for the antitrust harms that the indirect purchasers have suffered.

*Warfarin Sodium II*'s certification of a class for the purpose of settling indirect purchasers' antitrust claims is also distinguishable from this case. Unlike in *Warfarin Sodium II*, the District Court here included indirect purchasers from all states in a single class, even though indirect purchasers in many states lack standing to bring antitrust claims. Those members share no common question with the rest of the class because no amount of factual similarity with other class members will confer a right to recover upon them. They are categorically precluded from obtaining antitrust recovery regardless of whether De Beers's price-fixing and monopolization activity

43

requiring district courts to undertake rigorous state-by-state analyses in all cases.[16] We hold only that a district court abuses

disadvantaged them. Thus, the certification of this class, unlike in *Warfarin Sodium II*, has created a remedy for class members who have no substantive right to receive it.

*Warfarin Sodium II*'s certification under state antitrust statutes is unpersuasive in this context because the class at issue in that case did not include claims under the laws of states without *Illinois Brick* repealers. Thus, we never considered whether an indirect purchaser in a state without a repealer could use a class settlement as a means of obtaining recovery that the purchaser could not receive had he brought the suit in his individual capacity. We do not construe *Warfarin Sodium II* as approving such a result. In fact, we noted in *Warfarin Sodium II* that "there may be situations where variations in state laws are so significant as to defeat commonality and predominance, even in a settlement class." *Id.* at 529.

There can be no greater variation in state law than exists in the present case, where a plaintiff in one state has access to a remedy that is foreclosed to an identical plaintiff situated across state lines. Thus, we have not, as the concurrence suggests, departed from our holding in *Warfarin Sodium II* that a class may include plaintiffs whose claims differ significantly if all members share at least one common issue. We have instead recognized that a plaintiff who has no right to relief cannot join in the same class as a plaintiff who does, and that, if those two plaintiffs are included in a single proposed class, then the court may not certify that class because no common issue predominates with respect to both plaintiffs.

[16]In many cases, it will be evident that all class members share common legal or factual questions, even if the precise elements of proof for their claims vary among jurisdictions. Under such circumstances, a district court need not conduct an extensive

its discretion when, as in this case, it certifies a nationwide class of litigants whose claims implicate the laws of multiple jurisdictions, despite the fact that only some of those jurisdictions recognize the claims for which recovery is sought.[17]

---

inquiry into substantive state law to formally establish commonalities that are apparent. District courts in their sound discretion will determine the level of analysis to undertake when deciding whether variations in state law warrant detailed examination and a description of similarities and differences. In a case like this – where the class includes many people who could not pursue claims in an individual action – that more searching inquiry was needed, as the plaintiffs have tried to use class action procedures to create a bridge to recovery where otherwise none would exist.

[17]We briefly note that the indirect purchasers face factual obstacles to class certification notwithstanding the legal defects discussed above because competition in the market for rough gem diamonds waxed and waned during the class period. The class includes all indirect purchasers who acquired diamonds between January 1, 1994 and March 31, 2006, regardless of whether they obtained stones from De Beers or from a competitor. The record, however, reflects that many of De Beers's competitors did not participate in the alleged price-fixing conspiracy throughout that period.

As a result, some class members purchased diamonds in a market that was heavily influenced by De Beers while others did not. Gary French, an expert retained by plaintiffs to calculate damages and show class-wide antitrust impact, explained that

> during 1999 there was a substantial drop in the
> price of imported diamonds. This drop in price
> corresponds to a period of time when it is known

> that De Beers ... [was] selling off part of the stockpile of diamonds held in reserve. Thus, the per-unit value of rough diamonds fell closer to what may be considered "competitive" levels during the sell off.

(App. at 435.) French later testified that, in 2001, "De Beers temporarily allowed the market to set prices which led to a subsequent drop in polished diamond prices." (App. at 5020.)

Plaintiffs who purchased diamonds before 2001 may have different rights to recovery depending on whether their supplier was actively cooperating with De Beers price-setting efforts. *See Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005) (indicating that a § 1 plaintiff must prove that the defendant joined a conspiracy to restrain trade). Similarly, those who acquired diamonds in 2001, when De Beers allowed market forces to dictate pricing, likely have no antitrust claim because they made their purchases in a competitive market. *See Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 273-74 (3d Cir. 1999) (requiring plaintiffs to show that they have suffered an antitrust injury – i.e., an injury to competition – to obtain standing to bring an antitrust claim).

Thus, the class, as currently defined, includes members that acquired diamonds in a market controlled by the CSO, members that purchased diamonds from competitors that were not participating in the CSO's price-fixing activities, and members that have no antitrust injury whatsoever. Hence, class members have not sustained a uniform injury as the result of De Beers's antitrust conduct. Instead, their injuries depend upon when they purchased their diamonds and from whom they purchased them, and those injuries can be established only through individual proof. The class is therefore unworkable as these factual differences would defeat class certification

46

It may be that the antitrust and consumer protection statutes in a more limited number of states are sufficiently similar that common issues of law or fact would predominate with respect to plaintiffs in those jurisdictions. However, it was improper for the District Court to certify a nationwide class of plaintiffs based on state law when many states withhold antitrust standing from indirect purchasers and where the variability in consumer protection and unjust enrichment law in a context like this is extreme. Accordingly, we will vacate the District Court's certification order under Rule 23(b)(3) and remand this case for further proceedings.

On remand, the District Court should entertain renewed motions to certify classes that, at least as to state law claims, are not nationwide in scope, if such motions are made. For example, to obtain certification of an indirect purchaser class, plaintiffs would have to show that all class members share a right to recover for antitrust harms, such that one or more common issues affect all members' claims. We express no opinion regarding whether such a class can be formed or, if it can, which states' laws are sufficiently similar that plaintiffs in those states could be joined as class members. It would, however, be improper for the District Court to include in an indirect purchaser class plaintiffs whose claims arise in states that foreclose indirect purchasers from recovering for price-fixing or monopolization. Of course, the plaintiffs are not required to file new class certification motions, and nothing

---

notwithstanding the legal defects in the District Court's certification order that we have discussed above. *See Hydrogen Peroxide*, 552 F.3d at 311-12 ("[T]he task for plaintiffs at class certification is to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members.").

prevents them from prosecuting their claims in an individual capacity.

### 2. *Failure to Identify Class Claims*

If the District Court ultimately determines that certification of a more limited class of indirect purchasers is appropriate under Rule 23, any certification order that the Court issues must contain greater detail than the one currently on appeal. Under Rule 23(c), each class certification order must contain "(1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis." *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 782 (3d Cir. 2009) (quotations omitted); *see also* FED. R. CIV. P. 23(c)(1)(B) ("An order that certifies a class action must define the class and the class claims, issues, or defenses ... .").

As the objectors correctly note, the District Court's class certification order does not comport with the second requirement. The final order of certification adequately delineates the parameters of the indirect purchaser class, defining class membership to include purchasers in the United States who acquired any gem diamond from an entity other than De Beers or another rough diamond mining or production company, such as ALROSA, Rio Tinto, or BHP. It also identifies five legal issues supposedly common to the class.[18]

---

[18]The five issues are as follows:

    (a)    Whether [D]efendants combined or conspired with others to fix, raise, stabilize and maintain the prices of polished diamonds;

    (b)    Whether [D]efendants monopolized or combined

But the order does not identify what state law claims or defenses will receive class treatment.

The District Court recognized that the indirect purchasers were advancing state antitrust, consumer protection, and unjust enrichment claims, and that "variations exist between the antitrust and consumer protection laws of different states." (App. at 279.) However, the Court never identified pertinent state antitrust or consumer protection statutes, explained the relevant state common law of unjust enrichment, or described how those statutes and the common law affect class-wide rights. Nor did the Court indicate whether the class antitrust issues that it actually identified would affect the consumer protection and unjust enrichment claims. The failure to do so constitutes an abuse of discretion. *Cf. Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 185 (3d Cir. 2006) (concluding that a district court abuses its discretion when it articulates general issues of fact common to the class but fails to identify the particular claims that would be subject to class treatment).

---

or conspired with others to monopolize the supply of polished diamonds;
(c) Whether [D]efendants' conduct caused the prices of polished diamonds to be maintained at higher levels than would exist in a competitive market;
(d) Whether [P]laintiffs and the Class[es] are entitled to injunctive relief; and
(e) Whether [D]efendants' conduct caused injury to the business or property of [P]laintiffs and the other [Class and] Subclass Members and, if so, the appropriate class-wide measure of damages.

(App. at 1:276 (alterations in original).)

49

Thus, the District Court's class certification order is deficient because the precise claims subject to class treatment are not "readily discernible from the text" of the order and the accompanying opinion. *Id.* On remand, any certification order[19] must identify with particularity both the prerequisites for membership in the class and the issues or claims that will be resolved on a class-wide basis. This means that the order should identify class issues and explicitly state whether those issues apply to the indirect purchasers' antitrust, consumer protection, or unjust enrichment claims, or to some combination of the three. While the District Court need not follow a particular formula when setting forth class-wide issues, we have recommended that the format of an enumerated list can bring clarity to matters subject to class adjudication and facilitates appellate review of a certification order. *Id.* at 188 n.10. Accordingly, we will remand this case both because the indirect purchaser class as currently defined is overbroad and because the District Court's certification order did not sufficiently identify those claims and issues subject to the class treatment.

## B. *Certification Under Rule 23(b)(2)*

Rule 23(b)(2) applies only when a class seeks injunctive relief. It has no application "to cases in which the appropriate final relief relates exclusively or predominantly to money damages." *Beck v. Maximus, Inc.*, 457 F.3d 291, 301 (3d Cir. 2006). The relief sought in a Rule 23(b)(2) action must benefit the entire class, and the class representatives bear the burden of demonstrating that "the interests of the class members are so

---

[19]We express no opinion regarding whether a class could properly be certified following remand and provide guidance regarding the content of a certification order only to aid the District Court in disposing of a class certification motion, should the parties choose to file one.

like those of the individual representatives that injustice will not result from their being bound by such judgment in the subsequent application of principles of res judicata." *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 59 (3d Cir. 1994).

As with any claim for injunctive relief, the plaintiffs may not base a demand for an injunction solely upon past harm that they have suffered. The plaintiffs must demonstrate that, regardless of their past harm, they are likely to suffer harm in the future. *See In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 14 (1st Cir. 2008) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." (alteration in original) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974))). If the harm against which injunctive relief is sought dissipates during the course of the litigation, the basis for class certification likewise dissolves, and the class must be decertified. *Id.* at 14-16 (vacating certification of a Rule 23(b)(2) class to enjoin cross-border arbitrage in the market for new automobiles, because, following commencement of the action, the exchange rate between the U.S. dollar and the Canadian dollar fell, undercutting the economic viability of future anticompetitive arbitrage opportunities).

The District Court certified the direct and indirect purchaser classes under Rule 23(b)(2) for the purpose of awarding injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26. Unlike in a claim for damages, indirect purchasers seeking injunctive relief for an antitrust harm under § 16 do have standing. *In re Warfarin Sodium Antitrust Litig.* (*Warfarin Sodium I*), 214 F.3d 395, 399-400 (3d Cir. 2000). Section 16, however, creates no substantive rights. *Mid-W. Paper Prods. Co. v. Cont'l Group, Inc.*, 596 F.2d 573, 589-90 (3d Cir. 1979). But to have standing under § 16, a plaintiff must establish a

prospective threat of loss or damage as a result of conduct prohibited elsewhere in antitrust law. *Warfarin Sodium I*, 214 F.3d at 400. Here, the proponents of class certification relied upon De Beers's alleged price-fixing and monopolization in violation of §§ 1 and 2 of the Sherman Act to substantiate their right to injunctive relief.

The objectors argue that all class members lack standing to seek injunctive relief under § 16 of the Clayton Act because they have not shown an imminent threat of prospective antitrust injury. They aver that De Beers's price-fixing conduct ended in mid-2006, causing competition within the diamond industry to increase and rendering the injunction unnecessary.

Plaintiffs offer a two-fold response. They first rely on the District Court, which held that "the injunction ... is part of a compromise that De Beers entered into willfully" and that, "as such, De Beers has waived the right to demand proof of substantive elements of the claims." (App. at 285.) They say, in other words, that De Beers's willingness to stipulate to liability is sufficient in and of itself to establish a prospective threat of antitrust harm. That logic is unpersuasive, however, because, again, a defendant's willingness to stipulate to liability for the purpose of effectuating a class action settlement does not relieve the Court of its independent obligation to ensure that the facts of the underlying case adequately establish a basis for liability. *Ins. Brokerage*, 579 F.3d at 257 ("Confronted with a request for settlement-only class certification, ... [the] specifications of [Rule 23] ... designed to protect absentees by blocking unwarranted or overbroad class definitions ... demand undiluted, even heightened, attention ... ." (quoting *Amchem*, 521 U.S. at 620 (second alteration in original) (internal quotations omitted))). Thus, De Beers's decision not to contest the propriety of the injunction does not provide a basis for affirming the District Court's Rule 23(b)(2) certification order.

52

Plaintiffs and De Beers alternatively argue that the injunction, which took effect in mid-2006, was itself responsible for producing the pro-competitive trends in the diamond industry, and that the injunction is necessary to maintain those competitive advances. However, such a conclusion is not supported by the record. Experts retained by both the plaintiffs and De Beers identified numerous causes of increased competition in the diamond industry, including:

- The opening of Rio Tinto's Argyle mine in Australia in the mid-1980s, which ultimately became the largest production mine in the world in terms of carats.

- Argyle's severance of ties with the CSO in 1996, after which Rio Tinto began marketing diamonds independently of De Beers.

- The opening of new mines by competitors in Canada, beginning in the late 1990s and running through 2003.

- The exploration and opening of new mines in Angola in the late 1990s.

- The 2002 cessation of the purchase agreement between De Beers and BHP, which marked the end of De Beers's ability or willingness to purchase large quantities of competitors' diamonds.

- Limitations imposed by the European Commission in early 2006 on the amount of ALROSA diamonds that De Beers was permitted to purchase.

53

•    Increases in global diamond production by De Beers's competitors, which caused De Beers to lose market share.

According to the plaintiffs' and De Beers's experts, these factors appear to have caused De Beers's market share to fall from approximately 65% in 2000 to 45% by 2006. Plaintiffs' own experts indicated that, following mid-2006, market forces controlled diamond pricing so pervasively that the price from that point to the present provides a competitive benchmark against which to determine the amount of plaintiffs' damages as a result of price-fixing during the class period. At no point did any of the plaintiffs' or De Beers's experts mention the injunction in their damage calculations or conclude that it had any effect whatsoever on diamond prices. Moreover, neither the plaintiffs nor De Beers cite any place in the record reflecting such an effect.

Thus, while mid-2006 increases in competition may have roughly coincided with the District Court's issuance of the injunction, the record cannot support the conclusion that the injunction played a meaningful role in producing those competitive gains. Plaintiffs face no significant threat of future antitrust harm in the absence of the injunction because, according to their experts, the market has become increasingly competitive from 2006 onward, and "there is no longer any guarantee that the prices De Beers sets will hold in the marketplace."[20]    (App. at 4323.)    Plaintiffs therefore lack

_____

[20]Our concurring colleague says that we have mischaracterized the expert testimony by concluding that plaintiffs face no significant threat of future antitrust harm. (Concurring Op. at 18.) However, the plaintiffs' own expert opined that "De Beers is no longer able to control the quantities [of diamonds] available to the market as it had been in the past,"

antitrust standing under § 16 of the Clayton Act, and we will vacate the District Court's order certifying the injunctive class under Rule 23(b)(2). *See New Motor Vehicles*, 522 F.3d at 14-16 (vacating a district court's Rule 23(b)(2) certification order because changes in market conditions caused the threat of future antitrust injury to disappear).[21]

---

and that it has therefore lost the ability to set the price of rough diamonds. (App. at 4321, 4323.) An industry commentator cited by that expert concluded that, by July 2007, "De Beers [was] no longer providing the steady hand that controlled supply and kept prices stable. Prices might now be volatile, subject to the normal ups and downs of the marketplace." (*Id.* at 4318.) Further, the European Commission has closed an antitrust investigation against De Beers on the ground that the entry of new diamond producers "means that there is now more competition on the rough diamonds market." (App. at 4319.) Thus, we have noted only what the experts, including the plaintiffs' experts, have said: that the market has grown competitive to the point that De Beers cannot control the market price.

[21]The objectors alternatively challenge the substantive provisions of the injunction as inadequate to ensure that competitive forces continue to prevail in the market for rough gem diamonds. As we conclude that plaintiffs lack standing to pursue injunctive relief, we need not decide whether the terms of the injunction are sufficient to safeguard competitive market forces.

## IV. Conclusion

Though the District Court brought skill, experience, and much labor to its handling of this matter,[22] we are compelled to conclude, for the reasons stated, that it abused its discretion in certifying the settlement classes under Rules 23(b)(2) and 23(b)(3). Accordingly, we will vacate its judgment and remand the case for further proceedings consistent with this opinion.[23]

---

[22]The concurrence observes that, after years of proceedings, hundreds of pages of recommendations by the special master, and a lengthy opinion by the District Court considering over thirty timely objections, the objection of one person has become the undoing of a class certification. In our colleague's eyes, we have wielded "a sword rather than a scapel." (Concurring Op. at 2 n.1.) The concurrence thus seems to imply that our decision is an overreaction to a minor problem and evidences a lack of appreciation for the labor involved in achieving a settlement. That is not the case. We acknowledge with gratitude, as does the concurrence, the intense effort invested by the District Court in addressing this litigation. Nonetheless, the objection regarding the lack of predominance of class issues in this case raises an insurmountable hurdle to certification of the indirect purchaser class, as already described. As we have said, two plaintiffs cannot be joined in a single class to adjudicate the same set of facts when those facts give only one of them a legally cognizable claim. That a single objector raised this problem makes it no less salient than if all of the remaining class members had pointed it out.

[23]The objectors have also appealed two orders that awarded attorney's fees and approved payment of certain expenses to the settlement administrator. Those challenges are necessarily vacated in light of our conclusion that the class as currently defined was not amenable to certification. We express no

opinion regarding the reasonableness of the fee award or the expenses incurred by the settlement administrator, and those issues are subject to reconsideration by the District Court at an appropriate time.

57

RENDELL, Circuit Judge, concurring in the judgment.

I agree with the disposition chosen by the majority, namely remand, because the District Court failed to analyze the issues of commonality and predominance. However, I believe that the majority's opinion suffers from two overarching flaws. First, the majority dismisses out of hand our previous precedential opinion, *In re Warfarin Sodium Antitrust Litigation*, 391 F.3d 516 (3d Cir. 2004) ("*Warfarin II*"), a case that concerned remarkably similar claims and issues. Second, the majority undertakes its own analyses of predominance and plaintiffs' entitlement to injunctive relief, rather than allowing the District Court on remand to evaluate these issues in the first instance. The majority's approach is thus inconsistent with both our precedent and our role as a reviewing court.

I.

The majority opinion conflates two distinct inquiries: "Do common questions predominate?" and "Who should be included in the class?" Our court addressed each of these issues in *Warfarin II*. Curiously, the majority attempts to distinguish *Warfarin II* in a footnote. To my mind, *Warfarin II* binds us and should control our mode of analysis, if not the ultimate ruling on the issue of predominance as well. If we were to follow *Warfarin II*, I suggest that the District Court on remand could

1

revisit the two inquiries noted above and "tweak" the class and its definition rather than "gut" it as the majority suggests.[1]

---

[1] The proceedings leading up to the approval of the class and the proposed settlement required considerable judicial time and attention. The litigation began nine years ago and involved seven class actions that were ultimately consolidated before the District Court. The parties reached a preliminary settlement in 2005, and the District Court conditionally certified the class and appointed retired District Judge Alfred Wolin as a Special Master to review issues related to the settlement agreement. After two years of proceedings, Judge Wolin wrote a 175-page Report and Recommendation regarding notice to class members and the distribution of settlement funds, an 87-page Report and Recommendation regarding the award of attorneys' fees and reimbursement of costs, and two supplemental reports. Of the tens of millions of class members, thirty-four filed timely objections. The District Court considered these objections in a lengthy opinion, and ultimately decided to grant final class certification and approval of the settlement. Only one of these objections is the subject of the majority's opinion.

Although the fact that the District Court conducted such intricate proceedings is not controlling, it is clear that the settlement was welcomed by nearly all affected, and that the alleged flaws form the basis for only a few complaints. As noted in an amicus brief filed by a trade association of jewelry manufacturers and retailers urging affirmance, "a small number of consumers with modest claims and little financial interest in the outcome of the appeal" are being allowed to prevent "[a]n industry in financial straits" from recovering some of what it

2

In *Warfarin II* we were called upon to determine whether the certification of a settlement class was proper in a case arising out of DuPont Pharmaceuticals' alleged dissemination of misleading information about a competitor's product. 391 F.3d at 522. The *Warfarin* plaintiffs alleged that DuPont had engaged in conduct that allowed it to maintain a 67% market share and charge "supracompetitive" prices. *Id.* at 523. The specific claims asserted were remarkably similar to the claims asserted here. The plaintiffs alleged that DuPont had violated federal antitrust law, the antitrust statutes of the so-called "indirect purchaser" states, the consumer fraud and deceptive practices statutes of all fifty states and the District of Columbia, and the prohibitions on tortious interference and unjust enrichment contained in the common law of every state. *Id.* at 524-25. Here, plaintiffs allege that De Beers controlled most of the world's supply of diamonds, and imposed rigid constraints on the purchase and resale of those diamonds. According to plaintiffs, De Beers has artificially limited the supply of rough diamonds, controlled who can purchase them and when they can be purchased, and influenced the prices at which the diamonds can be resold. These activities allowed De Beers to inflate diamond prices and achieve a market share of 65% by 2000. Plaintiffs claim that De Beers's conduct violated federal

---

lost as a result of De Beers's conduct. Amicus Br. at 4. I submit that the wholesale rejection of what the District Court accomplished, based on the concerns raised by just one objector among tens of millions of class members, uses a sword rather than a scalpel and is uncalled for.

3

antitrust law and the antitrust, consumer protection, or unjust enrichment laws of every state and the District of Columbia.

Moreover, the threshold issue in *Warfarin II* was the same as it is here: did common issues predominate? In addressing the predominance issue, we engaged in an extensive discussion as to commonality and predominance:

> As the Supreme Court noted in [*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997)], "[p]redominance is a test readily met in certain cases alleging consumer[] fraud or violations of the antitrust laws." This case falls squarely into that category: plaintiffs have alleged that DuPont engaged in a broad-based campaign, in violation of federal and state consumer fraud and antitrust laws, to deceive consumers, [third-party payors], health care professionals, and regulatory bodies into believing that generic warfarin sodium was not an equivalent alternative to Coumadin. These allegations naturally raise several questions of law and fact common to the entire class and which predominate over any issues related to individual class members, including the unlawfulness of DuPont's conduct under federal antitrust laws as well as

4

state law, the causal linkage between DuPont's conduct and the injury suffered by the class members, and the nature of the relief to which class members are entitled.

Moreover, proof of liability for DuPont's conduct under § 2 of the Sherman Act and the Delaware Consumer Fraud statute depends on evidence which is common to the class members, such as evidence that DuPont made misrepresentations about Coumadin and generic warfarin sodium permitting DuPont to monopolize the market for warfarin sodium and charge supracompetitive prices for Coumadin, while discouraging class members to purchase the lower-priced generic competitor. In other words, while liability depends on the conduct of DuPont, and whether it conducted a nationwide campaign of misrepresentation and deception, it does not depend on the conduct of individual class members. Similarly, proof of liability does not depend on evidence that DuPont made deceptive communications to individual class members or of class members' reliance on those communications; to the

5

contrary, DuPont's alleged deceptive conduct arose from a broad-based, national campaign conducted by and directed from corporate headquarters, and individual reliance on the misrepresentations was irrelevant to liability. Finally, the fact that plaintiffs allege purely an economic injury as a result of DuPont's conduct (i.e., overpayment for warfarin sodium), and not any physical injury, further supports a finding of commonality and predominance because there are little or no individual proof problems in this case otherwise commonly associated with physical injury claims.

*Id.* at 527-29 (citations and footnote omitted).

We then considered the objection that "variations in and inconsistencies between the state consumer fraud and antitrust laws of the fifty states defeat the commonality and predominance requirements of Rule 23." *Id.* at 529. We described concerns as to manageability that may arise in class certifications for purposes of litigation, but commented that these concerns did not apply to the *Warfarin* class, which was certified "solely for purposes of settlement." *Id.* We noted that this was "key." *Id.* We then stated that, leaving case management issues aside, "there may be situations where variations in state laws are so significant so as to defeat commonality and predominance even in a settlement class

6

certification," but concluded that "this is not such a case."  *Id.* at 529-30.[2]  On this issue, we said:

> We agree with the District Court that the fact that there may be variations in the rights and remedies available to injured class members under the various laws of the fifty states in this matter does not defeat commonality and predominance.  In [*In re Prudential Insurance Co. America Sales Practice Litigation Agent Actions*, 148 F.3d 283 (3d Cir. 1998)], we noted that a "finding of commonality does not require that all class members share identical claims," and we rejected an objector's contention that predominance was

---

[2] In *Amchem*, the Supreme Court cautioned that the requirements of Rule 23 (other than manageability) "demand undiluted, even heightened, attention in the settlement context," in part because settlements deprive courts of "the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." 521 U.S. at 620.  However, the *Amchem* Court also recognized that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Id.* at 625.  We determined that *Warfarin II* fell "squarely into that category."  391 F.3d at 528.

7

defeated because claims were subject to the laws of fifty states. . . . In certifying a nationwide settlement class, the District Court was well within its discretion in determining that variations between the laws of different states were insufficient to defeat the requirements of Rule 23.

*Id.* at 530 (citations omitted).

Accordingly, we affirmed the District Court's ruling that common questions predominated. *Id.* at 528.[3]

---

[3] The majority distinguishes this case from *Warfarin II* on the basis that the *Warfarin* plaintiffs "shared a common claim under the Delaware Consumer Fraud Act." Maj. Op. at 42 n.15. However, we did not even address the Delaware statute in analyzing predominance; indeed, we acknowledged that "that there may be variations in the rights and remedies available to injured class members under the various laws of the fifty states." 391 F.3d at 530. Our discussion of the Delaware statute was limited to the issue of commonality; we referred to it as one of several reasons why commonality existed in the class. *Id.* at 528-29.

The majority also distinguishes *Warfarin II* on the basis that its "nationwide consumer protection claims . . . were founded upon deceptive marketing practices, which were properly cognizable under the laws of all fifty states." Maj. Op. at 43 n.15. Yet our analysis in *Warfarin* was much broader than the majority suggests. Rather than engaging in an independent

8

While the claims here, and the state laws implicated, are similar to those in *Warfarin II*, the District Court did not engage in a meaningful analysis or discussion of the issue of predominance. The Court acknowledged that "variations exist between the antitrust and consumer protection laws of different states." App. 279. However, the Court then indicated that it would be inappropriate to "weigh" claims for a variety of

---

analysis of whether every state's consumer protection law permits claims based on deceptive marketing practices, we considered the "consumer fraud *and* antitrust laws of the fifty states" as a whole, and concluded that "the fact that there may be variations in the rights and remedies available to injured class members under the *various* laws of the fifty states in this matter does not defeat commonality and predominance." 391 F.3d at 529-30 (emphases added).

Finally, the majority appears to distinguish *Warfarin II* as not having "included indirect purchasers from all states in a single class." Maj. Op. at 43 n.15. However, *Warfarin II* made no such distinction; to the contrary, we specifically noted that indirect purchasers were included in the class, and the class was defined as "[a]ll consumers or Third Party Payors in the United States who purchased and/or paid all or part of the purchase price of Coumadin dispensed during the period March 1, 1997 through and including August 1, 2001." 391 F.3d at 525. Although it may be true, as the majority contends, that there are potential class members who do not have a right to recover against De Beers, the District Court should be allowed to make that determination on remand, and then adjust the class definition if necessary.

9

reasons,[4] and concluded, without any analysis whatsoever, that,

_____

[4] The District Court determined that

[w]eighing claims, particularly Consumer claims, by different state laws would not be appropriate in this case for the following reasons:

a) De Beers, in the pursuit of a global settlement, demanded a release of potential damage claims in all 50 states; without class member releases from all 50 states, the settlement amount likely would have been less.

b) A nationwide class of consumers had been certified in the *Null* case.

c) All class members benefit from the additional value of the injunctive relief obtained.

d) Weighting class member claims based on the relative strength of different state law claims would be imprecise at best, would greatly add to the cost and complexity of processing claims, and would diminish the funds available for claimant recovery.

e) A nationwide antitrust class

10

as in *Warfarin II*, the variations were insufficient to defeat commonality and predominance.  App. 280.

I agree with the majority that more should have been done by the District Court than merely citing *Warfarin II*.  The concern with "weighing" claims does not do away with the need to address "predominance" in the process of class certification, and the District Court has an obligation to satisfy itself that it is not presented with a case where the "variations in state laws are so significant so as to defeat commonality and predominance even in a settlement class certification."  *Warfarin II*, 391 F.3d at 529-30.  Although the Court is free to conclude that the predominance requirement is "readily met" here, *see Amchem*, 521 U.S. at 625, because any differences in state law are "relatively minor" or can be addressed "by grouping similar state laws together and applying them as a unit," *see Prudential*, 148 F.3d at 315, its analysis must demonstrate that it has actually considered the scope and effect of any such differences, as well as the effect of any choice-of-law considerations, *see In re LifeUSA Holding Inc.*, 242 F.3d 136, 147 (3d Cir. 2001).  The District Court's opinion does not assure us that the Court considered these issues, and it does not provide us with any reasoning that would allow us to review the Court's conclusion

---

action is an expedient vehicle to resolve the disparate claims of the Direct Purchasers and the Indirect Purchaser Subclasses.

App. 279.

11

that none of the differences in state law "are sufficient to defeat commonality and predominance." App. 280.

Nonetheless, it is for the District Court on remand to review the claims, the relevant state laws, and the choice-of-law issues in reaching the conclusion as to predominance. I submit that all we must do is to tell the District Court to perform this analysis. It is for that Court, not our court, *see* Maj. Op. at 27-40, to conduct this analysis in the first instance.[5]

In conducting that analysis, the District Court need not survey state law on a claim-by-claim basis. While purporting to "review" the District Court's analysis, the majority engages in such a survey. This is not only a departure from our role as an appellate court, it is inconsistent with our analyses in both *Warfarin II* and *Prudential*. In *Warfarin II*, we never attempted to address the specific nuances of "the substantive laws of the fifty states" ourselves. *See* 391 F.3d at 529-30. Nor did we require the district court to explore the "variations among state antitrust statutes" without regard to whether such variations were mitigated by the other causes of action asserted by plaintiffs, as the majority does here, *see* Maj. Op. at 27. Rather,

_____

[5] It could be that the claims and laws here are sufficiently similar to those set forth and implicated in *Warfarin II*, thereby making the analysis fairly simple. There are, for instance, overlapping issues regarding "indirect purchasers" in both cases. *See* Maj. Op. at 14; *Warfarin II*, 391 F.3d at 525. But the District Court must analyze these issues to provide us with a basis for review.

12

we reached the straightforward conclusion that "the fact that there may be variations in the rights and remedies available to injured class members under the various laws of the fifty states in this matter does not defeat commonality and predominance." *Warfarin II*, 391 F.3d at 530. Similarly, in *Prudential*, the plaintiffs alleged violations of federal securities law, "common law fraud, breach of contract, bad faith, negligent misrepresentation, negligence, unjust enrichment, and breach of state consumer fraud statutes." 148 F.3d at 292. Although we acknowledged that "the class claims are subject to the laws of the fifty states," we approved the district court's approach of finding predominance "by grouping similar state laws together and applying them as a unit" in order to overcome "relatively minor differences in state law." *Id.* at 315. We did not require the district court to determine whether consumer protection or unjust enrichment laws, for instance, were "uniform among the fifty states," as the majority attempts to do here. Maj. Op. at 33.

Moreover, the majority sets forth discrete surveys of state antitrust law, unjust enrichment law, and consumer protection law, without ever addressing the salient issue of whether every class member might have *some* valid claim under state or federal law.[6] If every class member does have a valid claim of some

---

[6] I agree with the majority's statement that De Beers's price-fixing and monopolization *conduct* is at the core of plaintiffs' claims. *See* Majority Op. at 36 n.14. However, plaintiffs challenge that conduct under a variety of laws, not just antitrust laws, and it is for the District Court to determine, in the first instance, whether those other laws provide the plaintiffs

13

kind, then the next question is whether those claims can be grouped in such a way that common issues predominate. Thus, the majority misstates the focus of our inquiry when it proclaims that we must decide, as a matter of first impression, "whether variations among state antitrust statutes" defeat predominance, Maj. Op. at 27, and whether there is an "overriding common cause of action under a common body of law," Maj. Op. at 32. Rather, the question is whether the liability of De Beers is "capable of proof on a class-wide basis." *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 269 (3d Cir. 2009). The salient issue, therefore, is whether the common issues of fact and law presented by plaintiffs' claims, when examined together, outweigh any individual issues, such that a nationwide class of indirect purchasers can be certified. Although I agree with the majority that Rule 23 "presupposes that everyone in the class at least has a cause of action," Maj. Op. at 35, nothing in Rule 23, nothing in *Amchem*, and nothing in our decisions requires that everyone in the class have precisely the *same* cause of action.[7]

---

with valid causes of action.

[7] For the same reason, I disagree with the majority's claim that its approach serves the interests of federalism and ensures compliance with the Rules Enabling Act by preventing class actions from "extend[ing] recovery to a state law plaintiff when state courts would not recognize the plaintiff's harm as grounds for relief." Maj. Op. at 40. Our approach in *Warfarin II* and *Prudential* is premised upon the understanding that if a defendant's conduct gives rise to one cause of action in one state, and a different cause of action in another state, then it can

14

If De Beers's conduct gave rise to different types of claims, predominance can be satisfied as long as those claims can be grouped together in a way that allows them to be proven on a class-wide basis.[8]

The majority also concludes that predominance is not satisfied if the class includes certain members who may have no claim at all under the applicable state or federal law. But that fact should not affect predominance; rather, these people simply should not be included in the class that is certified. If, for instance (as the majority suggests), neither state nor federal law provides a New Jersey resident with a right to relief, then the class should be redefined so that it does not include persons whose right to relief is governed by New Jersey law. Issues

---

be appropriate to hear both claims in a single class action. This approach respects the states' recognition of different causes of action, and does not "enlarge . . . any substantive right" in violation of the Rules Enabling Act, 28 U.S.C. § 2072(b).

[8] At the same time, however, we have never required district courts, as part of the class certification process, to evaluate every nuance of each potential class member's claims. That type of inquiry would only mire district courts in endless class certification proceedings while failing to address the actual requirements of Rule 23. To the extent that there is a question about whether a specific class member is entitled to recover from the defendant, it should be addressed as part of the claims process, not the certification proceeding.

regarding what the applicable law would be, including choice of law, can be decided on briefs.

*Warfarin II* is instructive on this point as well, for, after concluding that the District Court did not abuse its discretion in determining that variations in state law did not affect predominance, we addressed arguments that certain persons—fixed co-pay consumers and third-party payors—should be "excluded" from the class because they, respectively, lacked "viable" claims or "standing." *Id.* at 530-31. However, we concluded that each group suffered direct, cognizable injury and was properly included. *Id.* Here, if the District Court determines that there are persons without any "viable" claims, the class simply should not include them. The issue is not one of predominance. Rather, it is one of an entitlement, or a right, to be in the class in the first place, and the resulting definition of the class can be tailored accordingly. The District Court has the duty to ensure that the class includes only those with real "claims." *Id.*

Thus, *Warfarin II* provides a road map, if not controlling reasoning, that should be our guide. The majority fails to afford it the respect it is due, and embarks on its own analysis. I suggest that it errs on both counts.

II.

The majority also vacates the certification of a class for injunctive relief based on a belief that the diamond market has become competitive. I suggest that this issue should be addressed on remand as well.

16

In *Warfarin I*, we laid out three straightforward requirements for plaintiffs to show that they are entitled to injunctive relief under section 16 of the Clayton Act. They must show "a threat of loss"; "that the injury in question is injury of the type the antitrust laws were intended to prevent"; and that "there is a significant threat of injury from a violation of the antitrust laws." *In re Warfarin Sodium Antitrust Litig.* ("*Warfarin I*"), 214 F.3d 395, 399 (3d Cir. 2000) (internal quotation marks, alterations, and citations omitted).

The majority opines that De Beers's market share of 45% (as of 2008) is so small as to preclude any significant threat of future injury from its conduct. Yet the District Court never addressed this argument, *see* App. 284-86, and the majority relies for its independent analysis on expert reports written in 2008 for a very different purpose: the parties' attempt to identify a valid methodology for calculating damages. Although the opinions do indicate that the experts believed that "De Beers has lost its dominant share" of the market, App. 4321, and that "the market for rough diamonds has become much more competitive since mid-2006," App. 4323, the experts did not opine, as the majority suggests, that "[p]laintiffs face no significant threat of future antitrust harm." Maj. Op. at 54. The District Court should have the opportunity to consider on remand whether De Beers continues to possess enough market power to pose a significant threat of harm to plaintiffs, rather

17

than having that inquiry foreclosed by the majority's reliance on expert reports that addressed a different issue.[9]

---

[9] I am also unpersuaded by the majority's disagreement with the propriety of accepting De Beers's stipulation to a risk of future harm. On this issue, the majority invokes *Amchem*'s caution that the "specifications of [Rule 23]—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context." 521 U.S. at 620. But De Beers is not stipulating that Rule 23(b)(2) is satisfied; indeed, the majority does not even address whether this case satisfies the Rule's requirement that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rather, De Beers's stipulation addresses the question of whether plaintiffs face "threatened loss or damage by a violation of the antitrust laws," as they must in order to satisfy section 16 of the Clayton Act, 15 U.S.C. § 26. Nothing in *Amchem*, *Warfarin I*, or the Clayton Act itself prevents De Beers from stipulating that such a threat exists.